Filed 4/19/13 opn. following U.S. Supreme Ct. remand

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE, | B185940 |
|        Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA042750) |
|    v. |  |
| ANTONIO BARBA, |  |
|        Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert J. Perry, Judge. Affirmed.

Marilee Marshall & Associates and Marilee Marshall, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Joseph P. Lee and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II of the DISCUSSION.

Antonio Barba appeals from the judgment entered after a jury convicted him of first degree murder. Our three previous decisions affirmed the judgment after rejecting Barba's contention that the court erred by admitting certain evidence on DNA findings. In each, the United States Supreme Court granted certiorari and remanded the matter with directions to reconsider our decision in light of that court's then-newest decision concerning whether evidence of forensic laboratory reports violated a defendant's Sixth Amendment right to confront and examine adverse witnesses when the laboratory personnel who prepared those reports did not testify at trial. After considering the high court's latest ruling, we once more affirm the judgment.

## FACTS AND PROCEDURAL HISTORY[1]

Cab driver Keum Kim was robbed and stabbed to death by a fare he had driven from Santa Monica to Venice in the early morning hours of July 8, 2001. Kim was dispatched in response to a phone call from a man identifying himself as Sergio who said he needed a ride to Brooks Street in Venice and wondered whether the driver might have change for a $50 bill. The murder was witnessed by a man who had stopped his car behind Kim's parked cab at the 800 block of Brooks Street. The witness saw Kim and the passenger struggle and then saw the passenger run from the cab into some nearby bushes. According to the witness, the passenger was wearing a blue, hooded sweatshirt that was covered with blood. However, the witness did not see the passenger clearly and was therefore unable to identify him. A search of the area by the police turned up a bloody kitchen knife and a dark sweatshirt covered with blood.

Los Angeles Police Detective Paul Inabu was the primary detective assigned to investigate Kim's murder. On July 10, 2001, Inabu requested that the knife and sweatshirt be sent to a crime lab for DNA analysis. Even though no suspect had as yet been identified, Inabu made that request to determine whether those items were even

---

[1]     The statement of facts is taken in large part from our previous decision. (*People v. Barba* (Jan. 23, 2012) [nonpub. opn.].)

connected to the crime and, if so, to preserve them in case a suspect was identified later on. DNA testing of blood samples from those two items showed the blood was Kim's.

On July 25, 2001, Inabu received an anonymous phone call from a woman who claimed Antonio Barba had killed Kim. After getting a search warrant, Inabu searched Barba's apartment, which was right near the spot where "Sergio" asked the taxi dispatcher to have Kim pick him up. The search turned up a knife that was identical to the murder weapon, but found no physical evidence linking Barba to the crime. Barba was arrested on August 2, 2001, and was formally charged with the murder and robbery of Kim in October 2002.

A police criminalist removed some hairs from the bloody sweatshirt and sent them to Orchid Cellmark (Cellmark), a DNA testing lab. A November 2001 test by Cellmark analyst Linda Wong produced no interpretable results from the hair samples. In February 2002, a police criminalist retrieved more hairs from the sweatshirt. Although they were not initially considered suitable samples for DNA testing, the hair was eventually sent on to Cellmark for a testing process that involved combining the hairs. When that was accomplished, there was only enough DNA to analyze nine genetic locations, not the 13 typically examined by Cellmark. Six of them were consistent with Barba's DNA profile.[2]

Barba was tried for murder and robbery, but a hung jury led to a mistrial in February 2004. Barba was retried starting in August 2004. Cellmark's lab director, Dr. Jennifer Reynolds, testified for the prosecution about DNA evidence in general and about the results of the tests performed by Wong, who no longer worked for Cellmark. Reynolds acknowledged that hair samples sent for testing could, in the abstract, have become contaminated from saliva, skin, blood, mishandling by the lab, and the failure to wash samples. Such contamination was always a possibility, she testified. Wong's notes did not indicate that she had washed the hairs that yielded the positive test results for

---

[2]     We state the facts concerning the DNA evidence in more detail in section **I.,** 1. of our Discussion, *post.*

Barba's DNA. The defense introduced evidence of several unrelated instances of lab contamination by police criminalists, along with evidence of 53 reported control discrepancies at Cellmark between March 2001 and December 2002.

The jury convicted Barba of first degree murder (Pen. Code, § 187, subd. (a)), but deadlocked on the robbery count (Pen. Code, § 211), which was then dismissed. Barba was given a sentence of life without possibility of parole, plus one year.

In his original appeal Barba contended: (1) the court committed error by denying his motion which charged that the prosecutor peremptorily challenged an African-American prospective juror because of his race; (2) the court erred by allowing in evidence the anonymous phone tip and portions of Barba's jailhouse conversations that were recorded by the police; and (3) the DNA evidence was inadmissible because the test results were hearsay and because allowing Reynolds to testify about Wong's test results violated his constitutional right to confront the witnesses against him. In November 2007, we issued our first opinion in this matter, affirming the judgment. (*People v. Barba* (Nov. 21, 2007, B185940) [nonpub. opn.] (*Barba I*).) On June 29, 2009, the United States Supreme Court granted Barba's petition for certiorari, vacated our earlier decision, and remanded the case to us with directions to reconsider our decision in light of its holding four days earlier in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), which concerned a defendant's constitutional right to confront adverse witnesses where the results of scientific tests were involved.

On remand, we affirmed again, distinguishing this case from *Melendez-Diaz* because the disputed DNA test report was admitted as part of the basis for the independent opinion of another expert witness. (*People v. Barba* (Feb. 21, 2009, B185940) [nonpub. opn.] (*Barba II*).) We also concluded that even if the report should not have been admitted in evidence, the error was harmless. Even though the only issue before us on remand was the applicability of *Melendez-Diaz*, because our entire decision in *Barba I* had been vacated, we restated our discussion as to the other issues that had been before us.

4

On June 28, 2011, the United States Supreme Court granted a new petition for certiorari from Barba, vacated our decision in *Barba II*, and remanded the case to us with directions to reconsider our decision in light of its holding in *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] (*Bullcoming*), which considered whether a defendant's constitutional confrontation rights were violated by having someone other than the person who conducted a laboratory analysis testify about the results and report of the person who actually conducted the test. On remand, we again affirmed the judgment. (*People v. Barba* (Jan. 23, 2012, B185940 [nonpub. opn.] (*Barba III*).)

On November 13, 2012, the United States Supreme Court granted Barba's petition for writ of certiorari in *Barba III* and asked us to reconsider our decision in light of its decision in *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*). As we did in *Barba II* and *Barba III*, although the United States Supreme Court has directed us to reconsider our decision only in light of its most recent Confrontation Clause decision, because it vacated our decision in *Barba III*, in Part **II** of our Discussion, we restate our analysis and holding from *Barba I, Barba II* and *Barba III* as to the issues not implicated by *Williams*.

## DISCUSSION

### I.
### CONFRONTATION CLAUSE ISSUES

*1.    The DNA Evidence*

Hairs from the blood-soaked sweatshirt discarded by Kim's killer were sent to Cellmark for DNA analysis. Three hair samples taken by the LAPD in September 2001 matched Kim's DNA, not Barba's. More hair samples taken from the sweatshirt in March 2002 also matched Kim's DNA, not Barba's.

The hair samples that implicated Barba were removed from the sweatshirt on February 21, 2002, by LAPD criminalist Michael Mastrocovo. He found 14 hairs and gave them to LAPD criminalist Susan Brockbank, who examined them and concluded

5

they had telogen roots, which were not suitable for DNA analysis. In May 2002, Mastrocovo told the prosecutor those hairs could be combined to produce a testable sample, but that doing so would destroy the sample, thereby precluding any further testing. The prosecutor said to perform the test, and Mastrocovo sent the 14 hairs to Cellmark with instructions to consume the samples if necessary. The LAPD's lab procedure manual recommended that before DNA testing was performed on hair samples, the hairs should be washed to reduce the presence of any contaminants. Mastrocovo did not wash these hair samples because he did not extract them.

In June 2002, Cellmark DNA analyst Linda Wong tested the 14 hairs sent by Mastrocovo. Wong had performed the previous DNA tests but, unlike those tests, her notes did not reflect that she performed the Chelex procedure, which involves washing the hairs to remove any contaminants that might have been deposited on them. Wong cut and combined the hair shafts and was able to locate only nine genetic locations instead of the 13 that were usually present. Of those nine, six were consistent with Barba's DNA.

Instead of lab analyst Wong, Dr. Jennifer Reynolds, the director of Cellmark's Maryland laboratory, testified about the DNA results. Reynolds's duties included performing technical reviews of case folders created by the lab's test analysts, independently drawing conclusions from the test results based on her own expertise and training, and either cosigning the reports or testifying about them in court. Reynolds ended this description of her job duties by stating, "as I have done today." According to Reynolds, the case file for the June 2002 testing included correspondence from the LAPD, test data and results, Wong's worksheets and handwritten notes, and reports of the test's conclusions. Analysts complete their lab notes and other documents at or near the time of the events. The materials in the file included all of the lab notes and worksheets that an analyst would have to fill out in the course of DNA testing. The information in the file was detailed enough to allow any qualified scientist to look at the file and determine what procedures had been used. For instance, Reynolds testified, the file included electropherograms, from which anyone with the proper training could determine

6

how the testing was done.  Those records were kept and maintained in the normal course of Cellmark's business.

Along with Reynolds's testimony, four DNA test reports were admitted in evidence:  (1)  Wong's November 27, 2001 report which determined that three hair samples taken from the killer's sweatshirt contained only Kim's DNA (Exhibit 27); (2)  Wong's March 26, 2002 report which determined that another sample taken from the sweatshirt contained only Kim's DNA (Exhibit 28); (3)  Wong's June 28, 2002 report which determined that the 14 hairs found in the sweatshirt matched Barba's DNA (Exhibit 29); and (4)  A June 10, 2004 report by lab analyst Terrill that another hair sample from the sweatshirt belonged to Kim, and not to Barba (Exhibit 35).[3]

These four reports were prepared in the identical format.  Each was on Cellmark letterhead, addressed to a police investigator.  Each bore the title, "REPORT OF LABORATORY EXAMINATION."  Each described the items being tested and the type of test performed – polymerase chain reaction (PCR) testing.  Under the heading "RESULTS," the reports said that DNA extracts were isolated from the items tested by using the "AmpF/STR Profiler Plus and/or AmpF/STR COfiler PCR Amplification Kits." The results section said that the DNA loci tested and the types obtained for each sample were listed in an attached table.

Under the heading "CONCLUSIONS," the reports stated whether the DNA matched Kim or excluded Barba.  A population database and frequency table was provided to show the frequency of unrelated individuals having the same DNA results depending on whether they were African American, Caucasian, or Hispanic.  The third page of the reports contained a table identified as "ALLELES DETECTED – PROFILER PLUS," and then set forth certain letter or numerical designations that corresponded to certain DNA loci.

---

[3]     These reports were not part of the appellate record in either *Barba I* or *Barba II*. In *Barba III,* we ordered the record augmented to include these trial exhibits.

7

Exhibits 27, 28, and 35 all stated that Barba was excluded as the source of the DNA. Exhibit 29, which implicated Barba, stated in the RESULTS section that "[a] portion of the hair shafts adjacent to the roots was used as a control. Any results obtained from this hair shaft control are likely due to DNA deposited on the exterior of the hair shaft." Under CONCLUSIONS, the report said that the DNA profile used six of nine loci and that Barba could not be excluded as the source. No conclusion about Barba could be reached as to the other three loci. The report's database frequency table said that only one in six million unrelated Hispanics would have the same DNA at those six loci. Under the ALLELES DETECTED table on the third page was the following notation: "In addition to the profiles obtained from the items referenced in this report, weak results were observed. These results may be due to the presence of DNA from more than one individual or to technical artifacts, and therefore were not interpreted." Each report was signed by the analyst and by a lab director.

Barba objected that having Reynolds testify instead of Wong violated his confrontation rights. Defense counsel said she believed the incriminating hair samples had been contaminated while in the LAPD's custody before being sent to Cellmark for testing, but that Wong's testimony was required because there was evidence she had not washed the hair samples, which would have eliminated any contamination. Without Wong's testimony, there would be no explanation of why that happened.

The trial court overruled the objection because it believed Wong's reports qualified as business records. However, Reynolds was allowed to testify only as to procedures that Wong's notes showed were actually conducted, or as to what the lab's standard protocols were. Reynolds was not allowed to speculate as to any procedures not reflected in Wong's notes, or why they might not have been performed. Reynolds testified that, in accord with her job duties, she was in court to give her own independent conclusions based on the contents of Wong's case file. According to Reynolds, only one in six million people would have the same six genetic markers as those that matched Barba.

8

Reynolds was vigorously cross-examined about Wong's testing procedures. Reynolds said that because the notes did not state that Wong had washed the hair samples before testing, Wong probably had not done so. Reynolds also testified that even though the test results were accurate as to the DNA found on the hair shafts, that did not mean the DNA had not been deposited there before testing. Nor could she rule out whether such contamination had occurred.

## 2. *Relevant Confrontation Clause Decisions*

Under the Sixth Amendment to the United States Constitution, a defendant in a criminal trial has the right to confront and cross-examine adverse witnesses (the Confrontation Clause). This provision bars the admission at trial of a testimonial statement made outside of court against a defendant unless the maker of the statement is unavailable at trial and the defendant had a prior opportunity to cross-examine that person. (*People v. Lopez* (2012) 55 Cal.4th 569, 580-581 (*Lopez*), citing *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*).) To be considered testimonial, the out-of-court statement: (1) must have been made with some degree of formality or solemnity; and (2) must have a primary purpose that pertains in some fashion to a criminal prosecution. However, the United States Supreme Court has been unable to agree on a precise definition of those requirements. (*Lopez,* at p. 581.)

### A. *The* Geier *Decision*

The defendant in *People v. Geier* (2007) 41 Cal.4th 555, was convicted of murder and rape based in part on DNA evidence tested by Cellmark. The analyst who performed the testing did not testify at trial. Instead, a lab director who co-signed the report did, and, based on the results and her review of the case file, testified that in her expert opinion the incriminating DNA matched that of the defendant. Geier contended his constitutional right to confront and cross-examine adverse witnesses was violated because the lab analyst did not testify. Our Supreme Court disagreed.

9

After examining disparate state and federal authority on the issue of whether scientific test reports were testimonial for purposes of the confrontation clause, the *Geier* court relied in large measure on *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), which involved two consolidated cases. The first involved the admissibility of a recording of a 911 phone call by a victim who was describing an attack upon her as it occurred. The second arose from the police response to a domestic disturbance call. After arriving at the scene and separating the couple, the officers questioned the victim and had her fill out and sign an affidavit describing the battery, which was later admitted at her attacker's trial. The *Davis* court held that the tape of the 911 call was admissible under the Confrontation Clause because the victim was describing events as they occurred and had the primary purpose of enabling the police to respond to an ongoing emergency. (*Geier, supra,* 41 Cal.4th at pp. 603-604, citing *Davis* at pp. 822, 827.) The domestic violence victim's statements were testimonial, the *Davis* court held, because they were made after an ongoing emergency had ended and their primary purpose was to establish or prove past events potentially relevant to a later criminal prosecution. (*Ibid.,* citing *Davis* at pp. 822, 829.)

Based on this, the *Geier* court concluded a statement was testimonial only if three requirements were all met: (1) it was made to a law enforcement officer or by a law enforcement officer or agent; (2) it describes a past fact related to criminal activity; and (3) it will possibly be used at a later trial. (*Geier*, *supra*, 41 Cal.4th at p. 605.) The *Geier* court found the second point determinative. Even though the analyst was working for the police and could reasonably anticipate the use of her test results at trial, those results "constitute[d] a contemporaneous recordation of observable events rather than the documentation of past events." (*Ibid.*) As a result, when the analyst recorded the results, she was not acting as a witness and was not testifying. (*Id.* at pp. 605-606.)

The *Geier* court believed that under *Davis, supra,* 547 U.S. 813, various types of laboratory reports were not testimonial because they were contemporaneous observations of recordable events. (*Geier, supra,* 41 Cal.4th at pp. 606-607.) Even before *Davis*, the *Geier* court observed, numerous courts looked to the circumstances under which

10

statements in laboratory reports and other forensic evidence were made in order to conclude that they were not testimonial despite their possible use at trial. (*Id.* at p. 607.)

The circumstances under which the DNA documents at issue in *Geier* were created led that court to conclude that they too were not testimonial. First, they were generated as part of a standardized scientific protocol conducted pursuant to the analyst's employment at Cellmark. Even though the prosecutor hoped to obtain evidence against Geier, the analyst's work product was part of her job, and was not intended to incriminate him. Second, to the extent the analyst's notes and reports recounted the procedures used, they were not accusatory because DNA analysis can lead to either incriminatory or exculpatory results. Third, the accusatory opinions that the DNA evidence matched Geier "were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness, [the lab director]." (*Geier, supra,* 41 Cal.4th at p. 607.) Accordingly, it was the circumstances under which the DNA report and notes were generated that led the *Geier* court to determine that those documents were not testimonial. (*Ibid.*)

### B. *The* Melendez-Diaz *Decision*

The defendant in *Melendez-Diaz, supra*, 557 U.S. 305, was convicted in Massachusetts state court of selling cocaine. A substance in the defendant's possession that was believed to be cocaine was sent to a lab for analysis, and the lab test confirmed it was cocaine. At trial, as permitted by Massachusetts law, a sworn affidavit known as a certificate of analysis was allowed in evidence in order to prove that the substance tested positive as cocaine. The analyst who performed the test did not testify at trial. The certificate said nothing more than that the substance was found to contain cocaine. At the time of trial, the defendant did not know what tests the analyst performed, whether those tests were routine, or whether interpreting their results required the exercise of judgment or skills the analyst did not possess.

The *Melendez-Diaz* court held that the affidavits fell within the core class of testimonial statements – such as depositions, prior testimony, declarations, and affidavits

11

– whose admission violates the confrontation clause.  (*Melendez-Diaz, supra,* 567 U.S. at pp. 309-310.)  Therefore, the analysts were witnesses and their affidavits were testimonial, meaning that the defendant had a right to "confront" them at his trial unless the analysts were unavailable for trial and the defendant had a previous opportunity to cross-examine them.  (*Id.* at p. 311.)  In short, "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence . . . was error."  (*Id.* at p. 329, fn. omitted.)

In *Barba II* we held that *Melendez-Diaz* did not apply because that decision did not consider the scenario present here, where the reports themselves did not contain a sworn certificate or affidavit attesting to their genuinness and accuracy and the DNA evidence came in through the in-court testimony of an expert witness who used the analyst's test materials to form her own independent opinion.

C.    *The* Bullcoming *Decision*

Bullcoming was arrested in New Mexico for drunk driving, and his blood sample was sent to a New Mexico state lab for testing.  The analyst who tested the sample determined that Bullcoming's blood alcohol level was .21 grams per hundred millimeters, which was very high.  The analyst recorded his results on a state-prepared form titled "Report of Blood Alcohol Analysis."  The report included a "certificate of analyst," affirming that:  the sealed sample he tested was received at the laboratory intact, with the seal unbroken; the statements made by the analyst were correct; and that he had followed the procedures set out on the back side of the form.  Those procedures required analysts to retain the sample container and raw data from the analysis and to note anything that might affect the integrity of the sample or otherwise affect the validity of the analysis.  No such notations appeared on the certificate for Bullcoming's test results.  Finally, under the heading "certificate of reviewer," a state lab examiner who reviewed the analysis certified that the person who tested the sample and prepared the report was qualified to do so and had followed the established procedures for conducting the test.

At Bullcoming's trial, the analyst who tested his blood sample did not testify because he had been placed on disciplinary leave. Instead, the prosecution called another analyst who was familiar with the lab's testing procedures but had not participated in or observed the test on Bullcoming's sample.

The trial court overruled Bullcoming's objection that allowing the other lab analyst to testify about the report violated his confrontation rights, and he was convicted of aggravated drunk driving. The New Mexico Supreme Court affirmed. That court said the certifying analyst was a mere scrivener who did nothing more than transcribe the results generated by the machine used to conduct the test. The substitute analyst who testified at trial was a qualified expert on the use of that machine and provided live, in-court testimony that was subject to cross-examination. As a result, the New Mexico court concluded, even though the certificate was testimonial, Bullcoming's right of confrontation was not violated.

In *Bullcoming, supra,* 131 S.Ct. 2705, the United States Supreme Court reversed. In a plurality opinion, the court held that the analyst's certificate was a testimonial statement that could not be introduced unless the analyst was unavailable for trial and the defendant had a prior opportunity to confront that witness. Justice Ginsburg delivered the four-part decision. However, part IV did not command a majority, and the concurring opinion of Justice Sotomayor, who also declined to join in part IV, sets the parameters of *Bullcoming's* reach. (*Panetti v. Quarterman* (2007) 551 U.S. 930, 949 [if no majority opinion, the narrower holding controls]; *Marks v. United States* (1977) 430 U.S. 188, 193 (*Marks*) [in plurality decision, court's holding is viewed as the position taken by the justices who concurred on the narrowest grounds].)

Part I of the *Bullcoming* decision contained the facts and procedural history. Part II explained why the surrogate analyst was an inadequate substitute for the analyst who performed the test. The court noted that the analyst's certification reported more than a machine-generated number. It also included the analyst's certification that he received the blood sample intact with the seal unbroken, that he had properly followed certain specified procedures, and that nothing happened to affect the integrity or validity

13

of the testing process. (*Bullcoming, supra,* 131 S.Ct. at p. 2714.) Even so, the comparative reliability of an analyst's testimonial report derived from machine-generated data does not overcome the confrontation clause, and analysts who write reports that the prosecution puts in evidence must be made available for examination at trial. (*Id.* at p. 2715.)[4]

Surrogate testimony by someone who qualified as an expert regarding the machine used and the lab's procedures could not convey what the actual analyst knew or observed when testing Bullcoming's blood sample, and cross examination would not expose "any lapses or lies" by the certifying analyst, the *Bullcoming* court held. This was especially significant because the analyst was on disciplinary leave, but was not declared unavailable by the prosecution. As a result, Bullcoming's lawyer could not question the analyst to determine whether he was incompetent or dishonest. (*Bullcoming, supra,* 131 S.Ct. at pp. 2715-2716.) In short, if the Sixth Amendment is violated, "no substitute procedure can cure the violation." (*Id.* at p. 2716.)

Part III of *Bullcoming*, which commanded a majority of the court, explained why the analyst's certificate was testimonial for purposes of the confrontation clause. The court rejected New Mexico's contention that the report was not adversarial or inquisitorial because it contained nothing more than the observations of an independent scientist created pursuant to a nonadversarial public duty. As the *Melendez-Diaz* court held, a document created solely for an evidentiary purpose in aid of a police investigation is testimonial. (*Bullcoming, supra,* 131 S.Ct. at pp. 2716-2717.)

Even though the analyst's certificate was not signed under oath, as was the case in *Melendez-Diaz,* the two documents were similar in all material respects, the *Bullcoming*

---

[4] In Part II of *Bullcoming*, footnote 6 mentioned *Melendez-Diaz's* observation that business and public records are generally admissible absent confrontation because they are usually created in order to administer an entity's affairs, not to prove a fact at trial. (*Bullcoming, supra,* 131 S.Ct. at p. 2714, fn. 6.) Although a majority of the court signed off on Part II of *Bullcoming,* Justices Ginsburg and Thomas did not join in footnote 6, and it is therefore part of the plurality holding only.

court held. (*Bullcoming, supra,* 131 S.Ct. at p. 2717.) As in *Melendez-Diaz,* a police officer provided a sample to a lab for testing to assist in a police investigation. An analyst tested the sample and prepared a certificate concerning the results. Finally, the certificate was formalized in a signed document that was sufficient to qualify the analyst's statements as testimonial despite the absence of notarization present in *Melendez-Diaz.* In short, the certificate was testimonial. (*Bullcoming,* at p. 2717.)

Part IV explained why the court did not believe that application of its holding would impose an undue burden on the prosecution by requiring it to produce the analyst who actually conducted a test and prepared a report. (*Bullcoming, supra,* 131 S.Ct. at pp. 2717-2719.)

Justice Sotomayor's concurring opinion had two express purposes: (1) to explain why the analyst's report was testimonial; and (2) "to emphasize the limited reach of the court's opinion." (*Bullcoming, supra,* 131 S.Ct. at p. 2719 (conc. opn. of Sotomayor, J).)

As to her first purpose, Justice Sotomayor reaffirmed the principle that a statement is testimonial if its primary purpose was evidentiary – to create an out-of-court substitute for trial testimony. (*Bullcoming, supra,* 131 S.Ct. at pp. 2719-2720 (conc. opn. of Sotomayor, J).) She agreed with the majority that the lab analyst's certificate was sufficiently formal to suggest its evidentiary purpose despite the absence of an affirmation under oath that was present in *Melendez-Diaz.* However, she noted that formality is not the only test to determine whether a report is testimonial. (*Id.* at pp. 2720-2721.)

As to her second purpose, Justice Sotomayor pointed out four circumstances not present in *Bullcoming*. First, this was not a case where the state suggested an alternate primary purpose for the report, such as medical reports created while treating a patient. (*Bullcoming, supra,* 131 S.Ct. at p. 2722 (conc. opn. of Sotomayor, J.).)

Second, because the surrogate analyst testified that he had no part in producing any portion of the report and did not observe the testing process, "this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." (*Bullcoming, supra,* 131 S.Ct. at

p. 2722 (conc. opn. of Sotomayor, J.).) For example, a supervisor who observed an analyst conducting the test might be allowed to testify about the results. Justice Sotomayor did not address the precise degree of involvement necessary to justify testimony by someone other than the analyst because the surrogate analyst who testified at Bullcoming's trial had no involvement in the test and report. (*Ibid.*)

Third, this was "not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence. [Citation.]" (*Bullcoming, supra,* 131 S.Ct. at p. 2722 (conc. opn. of Sotomayor, J.).) That scenario would present a different question, Justice Sotomayor explained.

Fourth, the case did not involve only machine-generated results. Instead, the prosecution introduced the analyst's statements about the results of the test, the procedures used, and their validity and integrity. Therefore, the decision did not consider whether the prosecution could introduce raw, machine-generated data in conjunction with expert witness testimony. (*Bullcoming, supra,* 131 S.Ct. at p. 2722 (conc. opn. of Sotomayor, J.).)

In *Barba III*, we again affirmed, holding that as to Reynolds's testimony alone, it fell under the exception for the independent opinion of an expert witness based on underlying testimonial reports not placed in evidence, as suggested in Justice Sotomayor's concurring opinion. As for admitting in evidence the three DNA reports that excluded Barba as a DNA donor, we held that any error was harmless beyond a reasonable doubt. As for admitting in evidence the one report that found a "match" with Barba's DNA, we held that the error was harmless because: (1) it contained no affirmations that all testing procedures had been correctly followed; (2) Reynolds was forced to concede that Wong had not washed the hair samples, which confirmed the key defense claim against Cellmark's handling of the samples; (3) Reynolds conceded on cross examination that she could not rule out the possibility that the samples had been contaminated; and (4) the report was virtually meaningless without Reynold's expert testimony.

16

*Williams* arose from the kidnap, rape, and robbery of a Chicago woman in February 2000.  Vaginal swabs were taken as part of a sexual assault examination and the Illinois State Police sent those swabs to a Cellmark lab for DNA analysis.  Cellmark tested the swabs and produced a DNA profile of the semen donor.  Defendant Williams had not been identified as the perpetrator and was not considered a suspect in that crime when the Cellmark DNA profile was created.  Williams was arrested in August 2000 on unrelated charges.  A sample of his blood was taken at that time, from which the state police lab created a DNA profile.  Sometime later, state police crime lab analyst Sandra Lambatos conducted a computer search of DNA profiles in the state police database to see if any matched the DNA profile that Cellmark had produced from the rape victim's vaginal swabs.  Lambatos determined that the Cellmark profile from the vaginal swabs matched the state crime lab's DNA profile of Williams produced from his August 2000 blood sample.  Williams then took part in a lineup where the rape victim identified him as her attacker.  At trial, Lambatos testified about her conclusions based on the Cellmark DNA report, but the report itself was not in evidence.

Williams was found guilty at a bench trial and the Illinois Court of Appeals and Supreme Court each affirmed that judgment.  At issue in those appeals was whether Lamabtos's testimony concerning the match between the state police lab and Cellmark DNA profiles violated Williams's Sixth Amendment confrontation rights.

The United States Supreme Court affirmed the judgment, yet remained as fractured as it had in *Bullcoming*.  In a plurality opinion written by Justice Alito, the court set forth two independent grounds why Lambatos's expert testimony did not violate the Confrontation Clause.  In the first of these, Justice Alito said that the testimony was not admitted for its truth.  Instead, the prosecution expert's references to the underlying DNA reports had the limited purpose of explaining the basis of Lambatos's independent expert conclusion that Williams's DNA from the state police lab profile matched the profile that Cellmark produced from the victim's vaginal swabs.  (*Williams, supra,* 132 S.Ct. at

17

p. 2228 (plur. opn. of Alito, J.).) Because this was a bench trial, it was far more likely that the trial judge was able to evaluate this evidence for this limited purpose. (*Id.* at pp. 2236-2237.)

The plurality's alternative ground rested on the conclusion that the Cellmark DNA report was not testimonial for purposes of Confrontation Clause analysis. The *Williams* plurality reasoned that the confrontation clause had not been violated because the Cellmark report was prepared for the primary purpose of finding a dangerous rapist who was still at large, not for the primary purpose of targeting an accused individual. (*Williams, supra,* 132 S.Ct. at p. 2243 (plur. opn. of Alito, J.).)[5]

Justice Thomas wrote a separate concurring opinion, concluding that even though Lambatos's testimony about the Cellmark DNA report went to the truth of that report, the report was not testimonial because it "lack[ed] the solemnity of an affidavit or deposition." (*Williams, supra,* 132 S.Ct. at p. 2260 (conc. opn. of Thomas, J.).) Justice Kagan, joined by Justices Scalia, Ginsburg, and Sotomayor, dissented. According to the dissent, testimony about the Cellmark DNA by Lambatos (who was not affiliated with Cellmark) violated Williams's right to confront the Cellmark analyst who prepared the report because the expert's statements went to the truth of that report. (*Id.* at p. 2276 (dis. opn. of Kagan, J.).)

     E.     <u>*Post*-Williams *Decisions of the California Supreme Court*</u>

     *(i)*     <u>People v. Lopez</u>

On October 15, 2012, the California Supreme Court issued a trio of companion cases interpreting *Williams*: *Lopez, supra,* 55 Cal.4th 569; *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*); and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*).

---

[5] However, as we discuss in detail in our analysis, the plurality's language veered from this limiting language and signaled a far broader holding.

The defendant in *Lopez* was found guilty of vehicular manslaughter while intoxicated. (Pen. Code, § 191.5, subd. (b).) At trial, a sheriff's department criminalist testified that he had reviewed a lab report – made by a colleague – which showed that the defendant's blood alcohol level was .09 percent two hours after the collision. The criminalist testified that based on his own separate abilities he too concluded that the defendant's blood alcohol level was .09 percent. The criminalist testified that he had worked at the lab for 17 years, knew its procedures for processing and testing blood samples, had trained the analyst who actually tested the defendant's blood, and that all lab technicians receive the same training. The report was also allowed in evidence.

After the Court of Appeal affirmed the judgment, our Supreme Court granted review and ordered the appellate court to reconsider its holding in light of *Melendez-Diaz*. The Court of Appeal then reversed the judgment, and the California Supreme Court granted review. The *Lopez* court noted *Geier's* holding that the DNA evidence at issue in that case was not testimonial because it was a contemporaneous recordation of observable events. (*Lopez, supra,* 55 Cal.4th at pp. 577, 581.) However, the *Melendez-Diaz* and *Bullcoming* courts held that the lab reports at issue in those cases were testimonial even though they contained near-contemporaneous observations of a scientific test. (*Ibid.* citing *Melendez-Diaz, supra,* 557 U.S. at p. 315, and *Bullcoming, supra,* 131 S.Ct. at pp. 2714-2715.)

To resolve this issue, the *Lopez* court looked to *Crawford, Melendez-Diaz, Bullcoming,* and *Williams*. (*Lopez, supra,* 55 Cal.4th at p. 581.) It held that the portions of the lab report that contained nothing other than the machine-generated results of the test performed were not sufficiently formal or solemn to be testimonial under the Confrontation Clause because they lacked any attestations or assertions of validity, and because there was no way to cross-examine the machine that generated those results. (*Id.* at pp. 582-583.) The same was true as to portions of the report that functioned like a chain of custody report by showing that it was the defendant's sample being tested. Those notations, on a chart captioned "FOR LAB USE ONLY", were instead nothing more than an informal record of data for internal purposes. (*Id.* at pp. 583-584.)

19

*(ii)*     People v. Dungo

The defendant in *Dungo, supra,* 55 Cal.4th 608, was convicted of murder. A prosecution forensic pathologist testified that the victim had been strangled. That expert's opinion testimony was based on objective facts concerning the condition of the body that another pathologist observed and recorded in the autopsy report. The report itself was not placed in evidence. The Court of Appeal reversed the judgment, concluding that the defendant's Confrontation Clause rights had been violated.

The *Dungo* court reversed. Justice Kennard's lead opinion, in which four other justices concurred, determined that the autopsy report was not testimonial under the Confrontation Clause. First, the expert testified as to only the physical observations recorded in the autopsy report, not as to the conclusions reached by the pathologist who conducted the autopsy and prepared the report. Such observations lack the formality required under the Confrontation Clause. (*Dungo, supra,* 55 Cal.4th at pp. 619-620.)

Second, the court held that autopsy reports do not have the primary purpose of targeting an accused individual. Autopsy reports are required by law for certain types of deaths – some related to criminal activities and some not. (*Dungo, supra,* 55 Cal.4th at p. 620.) Such reports therefore serve many purposes: to allow a decedent's family to learn whether a wrongful death action is warranted; for insurance companies to determine whether a death is covered under one of its policies; and to provide answers to grieving family members or satisfy the public's interest in the death of newsworthy persons. (*Id.* at p. 621.) Although autopsy reports are sometimes prepared for criminal investigations, their primary purpose is to provide an official explanation for an unusual death. Such official records are not ordinarily testimonial. (*Ibid*.)

Justice Chin wrote a concurring opinion, which was joined by three other justices. In it, he amplified the lead opinion's reasoning in light of the plurality opinion in *Williams*. According to Justice Chin, the autopsy report did not have the primary purpose of accusing the defendant or any other targeted individual of having committed a crime.

20

Instead, its primary purpose was to describe the condition of the victim's body. (*Dungo, supra,* 55 Cal.4th at p. 630 (conc. opn. of Chin, J.).)[6]

### (iii)    People v. Rutterschmidt

The court in *Rutterschmidt, supra,* 55 Cal.4th 650, considered the appeal of a murder conviction from a trial where a lab director testified as a prosecution expert that, based on lab tests conducted by others, the victims had been drugged. The *Rutterschmidt* court declined to address whether a Confrontation Clause violation occurred, opting instead to affirm on the ground that any error was harmless beyond a reasonable doubt based on other overwhelming evidence of the defendants' guilt. (*Id.* at p. 661.)

### F.    *Post-* Williams *Decisions By the California Court of Appeal*

### (i)    People v. Huynh

The defendant in *People v. Huyhn* (2012) 212 Cal.App.4th 285 (*Huynh*) was charged with drugging and murdering one man, and with drugging and sexually assaulting another. The surviving victim had no memory of what occurred and was taken to a medical facility, where a sexual assault exam was performed. The nurse who conducted that exam observed and photographed various signs that the victim had been sodomized and otherwise sexually assaulted. That nurse was unavailable to testify at defendant's trial, so her supervisor testified about the examination results in her stead, opining based on the photographs that the victim's anus showed signs of significant trauma.

Division 1 of the Fourth District rejected the defendant's claim that the substitute witness's testimony violated the Confrontation Clause. After discussing recent United States Supreme Court Confrontation Clause decisions, including *Williams,* along with the California Supreme Court's ruling in *Dungo,* the *Huynh* court found *Dungo* most

---

[6]    We explain Justice Chin's reasoning in greater detail in section **I.,** 5. of our **DISCUSSION**, *post,* where we analyze *Williams* and its applicability to this case.

analogous.  Because the defendant was not a suspect and was not the target of a criminal investigation when the exam was performed, the court held that the primary purpose of the sex assault exam and the photographs was to show the condition of the victim's body, not to accuse a targeted individual.  (*Huynh, supra,* 212 Cal.App.4th pp. 320-321.)

### *(ii)*    People v. Holmes

In *People v. Holmes* (2012) 212 Cal.App.4th 431 (*Holmes*), Division Six of this court considered a case similar to ours:  a defendant convicted of burglary, robbery, and murder challenged the judgment under the Confrontation Clause because lab supervisors testified about DNA results found on evidence at the crime scene, not the analysts who conducted those tests.  Relying on *Dungo,* the appellate court held that no Confrontation Clause violation occurred because the unsworn and uncertified lab reports lacked the formality required to find such a violation.  (*Id.* at pp. 437-438.)

### *(iii)*    People v. Westmoreland

The court in *People v. Westmoreland* (2013) 213 Cal.App.4th 602 affirmed the murder and robbery convictions of a defendant who claimed his Confrontation Clause rights were violated when a forensic expert testified based on both the observations and conclusions contained in an autopsy report prepared by someone else.  The appellate court noted that the case was unlike *Dungo* because the expert testified about someone else's conclusions, not just his observations, and because the autopsy report itself was placed in evidence.  Even so, no Confrontation Clause violation occurred, the court held, because *Dungo's* conclusion about the primary purpose of autopsy reports extended beyond the more limited facts of that case.  (*Id.* at pp. 623-624.)

### *(iv)*    People v. Steppe

The court in *People v. Steppe* (2013) 213 Cal.App.4th 1116 affirmed a conviction for attempted murder against the defendant's contention that his Confrontation Clause rights were violated when a laboratory's technical reviewer gave her own independent

opinion that the defendant's DNA matched that retrieved from certain evidence, as opposed to having the technician who performed the tests testify at trial. Interpreting both *Williams* and *Lopez*, the *Steppe* court held that no Confrontation Clause violation occurred.

First, as to the testimony referring to the raw data generated from the tests, such machine-generated results are not testimonial under *Lopez.* (*Steppe, supra,* 213 Cal.App.4th at p. 1126.) As to the reviewer's testimony that she reached the same conclusion about a DNA match as did the analyst who performed the test, the court found no Confrontation Clause violation for the following reasons: (1) there had already been testimony that the lab would not issue a report unless a reviewer concurred in the analyst's finding, meaning that the jury already knew that the analyst and the reviewer had reached the same conclusion; (2) under *Williams* and *Lopez,* such reports are not formal and solemn enough to be testimonial; and (3) the reviewer's brief reference to the analyst's report and her reliance on the raw data it contained were proper under California law because "such items are reasonably relied on by experts in the field of DNA analysis in forming their opinions." (*Id.* at pp. 1126-1127, citing to *People v. Gardeley* (1996) 14 Cal.4th 605, 618, for the third reason.)

### 3. *How To Interpret* Williams

In *Barba III*, we interpreted *Bullcoming* in accord with Justice Sotomayor's concurring opinion under the rule that a fragmented court's holding may be viewed as that position taken by a majority of justices who concurred on the narrowest grounds. (*Marks, supra,* 430 U.S. at p. 193.) When the California Supreme Court set out to interpret *Williams*, however, it found that rule ill-suited to the disparate reasoning employed by the plurality and Justice Thomas's concurring opinion.

In *Dungo, supra,* 55 Cal.4th 608, the court held that one pathologist could testify about an autopsy report prepared by another because such reports had multiple purposes and therefore did not have the primary purpose of serving as testimony at trial. Justice Kennard wrote the lead opinion, which was joined by Chief Justice Cantil-Sakauye and

23

Justices Werdegar, Baxter, and Chin. However, Justice Chin wrote a concurring opinion, joined by the Chief Justice and Justices Baxter and Werdegar, that amplified the reasoning of the lead opinion.

Justice Chin's first task was to stake out the analytic guideposts for a decision as fractured as that in *Williams*. Because Justice Thomas's concurring opinion at least partly contradicted the *Williams* plurality, it could not be a logical subset of the plurality opinion, thereby making the *Marks* rule inapplicable. (*Dungo, supra,* 55 Cal.4th at p. 628 (conc. opn. of Chin, J.).) However, a legal opinion that commanded a majority of the Supreme Court is not required to find that court's reasoning. Instead, we need find nothing more than a legal standard which, when applied, will necessarily produce a result with which a majority of that court would agree. (*Ibid*, citing *U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157.)

Justice Chin explained that under this interpretive rule, the *result* in *Williams* allowed a majority of our Supreme Court in *Dungo* to discern a standard that would command the support of a majority of the *Williams* court. Because a majority of that court found no Confrontation Clause violation, albeit for different reasons, if such a ruling in *Dungo* would comport with the reasoning of both the plurality and concurring opinions in *Williams,* then an affirmance was possible. (*Dungo, supra,* 55 Cal.4th at p. 628 (conc. opn. of Chin, J.).) "Accordingly, we must determine whether there was a confrontation clause violation under Justice Thomas's opinion *and* whether there was a confrontation clause violation under the plurality's opinion. If there were no violation under both opinions, then the result (finding no confrontation clause violation) would command the support of a majority from the high court's *Williams* case. Such a test satisfied the requirements of both the plurality opinion and Justice Thomas's concurrence." (*Id.* at pp. 628-629, original italics.)[7]

---

[7]     Even if Justice Chin's concurring opinion does not rise to the level of binding precedent, we may rely on it because it was signed by four of the court's seven justices. (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 [rejecting appellant's reliance on a Supreme Court concurring opinion because no other justices joined in].) At a

*4.      The* <u>Williams</u> *Plurality's Holding Regarding the Primary Purpose of DNA Testing*

Under the interpretive rule announced in *Dungo,* we may affirm if we can find that there was no confrontation clause violation under the rationales employed by both the plurality and Justice Thomas's concurring opinion in *Williams*. In our view, Justice Thomas would likely affirm because the DNA reports created by Wong for this case were not sworn or certified declarations of fact that attested to their accuracy and reliability, and were therefore not sufficiently formal or solemn enough to invoke the protections of the Confrontation Clause. (*Williams, supra,* 132 S.Ct. at p. 2260 (conc. opn. of Thomas, J.).)[8] We must then determine whether the *Williams* plurality would have reached the same result, albeit for different reasons.

The alternative ground for the *Williams* court's plurality opinion was the determination that the Confrontation Clause would not have been violated even if the Cellmark DNA report had been admitted in evidence. According to the plurality, the report in that case did not have the primary purpose of targeting an accused individual and therefore was not testimonial. (*Williams, supra,* 132 S.Ct. at pp. 2242-2243 (plur. opn. of Alito, J.).) Barba understandably latches onto this language because he was not only a suspect in Kim's death when the DNA tests were conducted, he was in custody after having been charged with the crime. However, as we indicated earlier, we believe the *Williams* plurality has a broader reach.

---

minimum, we consider it persuasive authority and a reliable indicator of how a majority of the court would rule.

[8]      Barba contends that Justice Thomas would view the DNA reports as sufficiently formalized and solemn to be considered testimonial because, if they were falsified, a felony would have been committed under Penal Code section 134. We reject that contention.

Penal Code section 134 states that it is a felony to prepare any false document or object with the intent that it be produced at trial for any fraudulent purpose. That provision would apply with equal force to documents that are not testimonial under the Confrontation Clause, such as the autopsy reports in *Lopez* and *Dungo*. That would not make them testimonial just because they had been falsified.

25

We begin by setting forth in full the *Williams* plurality's rationale for concluding that DNA test reports were not testimonial under the Confrontation Clause. In describing the holding that would appear later in the decision, the plurality noted that the "Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. [Citation.] The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial." (*Williams, supra,* 132 S.Ct. at p. 2228 (plur. opn. of Alito, J.).)

When the *Williams* plurality turned to its analysis and discussion of this issue, it noted that the *Melendez-Diaz* and *Bullcoming* courts did not hold that all forensic reports were testimonial statements. In those cases, the reports violated the Confrontation Clause "because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. There was nothing resembling an ongoing emergency, as the suspects in both cases had already been captured, and the tests in question were relatively simple and can generally be performed by a single analyst. In addition, the technicians who prepared the reports must have realized that their contents

26

(which reported an elevated blood-alcohol level and the presence of an illegal drug) would be incriminating.

"The Cellmark report is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual. In identifying the primary purpose of an out-of-court statement, we apply an objective test. [Citation.] We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances. [Citation.]

"Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the [state police] lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile it produced would turn out to inculpate petitioner – or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile. [Citation.]

"The situation in which the Cellmark technicians found themselves was by no means unique. When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating – or both.

"It is also significant that in many labs, numerous technicians work on each DNA profile. . . . When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures.

27

"Finally, the knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard. In this case, for example, [police laboratory analyst] Lambatos testified that she would have been able to tell from the profile if the sample used by Cellmark had been degraded prior to testing. As noted above, moreover, there is no real chance that 'sample contamination, sample switching, mislabeling, [or] fraud' could have led Cellmark to produce a DNA profile that falsely matched petitioner. *Post*, at [2275], (Kagan, J., dissenting). At the time of the testing, petitioner had not yet been identified as a suspect, and there is no suggestion that anyone at Cellmark had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of petitioner, who just so happened to be picked out of a lineup by the victim. The prospect is beyond fanciful.

"In short, the use at trial of a DNA report prepared by a modern, accredited laboratory 'bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.' [Citation.]" (*Williams, supra,* 132 S.Ct. at pp. 2243-2244 (plur. opn. of Alito, J.).)

5.      *The* Dungo *Court's Analysis of* Williams

We next examine Justice Chin's concurring opinion in *Dungo, supra,* 55 Cal.4th 608, which commanded a majority of the court. Justice Chin concluded that the autopsy report statements relied on at trial by the expert witness were not testimonial because their primary purpose was to describe the condition of the victim's body. In doing so, Justice Chin stated that "there was no prospect of fabrication or incentive to produce anything other than a scientifically reliable report. The purpose of this part of the autopsy report is 'simply to perform [the pathologist's] task in accordance with accepted procedures." (*Dungo, supra,* 55 Cal.App.4th at p. 630 (conc. opn. of Chin, J.), quoting *Williams, supra,* 132 S.Ct. at p. 2244.)

Justice Chin's concurring opinion went on to observe that "practical considerations" helped to inform the *Williams* plurality, pointing to the plurality's statement that economic pressures would likely cause prosecutors to forego the use of DNA testing if they had to call the technicians who helped prepare a DNA profile. Similar considerations were at play for autopsy reports, Justice Chin wrote. (*Dungo, supra,* 55 Cal.4th at p. 631 (conc. opn. of Chin, J.), citing *Williams, supra,* 132 S.Ct. at p. 2228.)

Justice Chin acknowledged that the circumstances in *Dungo* supported the contention that the autopsy report's primary purpose was to accuse the defendant in that case of a crime. "Unlike the situation in *Williams,* defendant was a suspect at the time the autopsy report was prepared. An investigator was present during the autopsy, and the pathologist had been told of defendant's confession before the autopsy report was written." (*Dungo, supra,* 55 Cal.4th at p. 632 (conc. opn. of Chin, J.).) Even so, he did not believe that the *Williams* plurality intended to allow evidence of DNA reports only when there was no identified suspect at the time the report was prepared. "Although the plurality in *Williams* stated that the defendant in that case happened not to be a suspect or in custody at the time the report was prepared, nothing in its opinion suggests that this is a *requirement* rather than merely one of 'the surrounding circumstances' of which the court must take account." (*Ibid.* citing *Williams, supra,* 132 S.Ct. at p. 2243, original italics.)

The key distinction for Justice Chin was that the opinion concerning the manner of death came from the testifying expert who was subject to full cross examination, and not from the report, which was not placed in evidence. (*Dungo, supra,* 55 Cal.4th at p. 632 (conc. opn. of Chin, J.).) In forming his opinion, the testifying expert relied on statements in the autopsy report concerning the condition of the victim's body. Such statements "are objective observations of the type routinely placed into autopsy reports, whether or not a specific suspect exists. They are not statements with a primary purpose of accusing defendant, or anyone else, of criminal conduct. The fact that the larynx and hyoid bone were not broken, like most of the other observations memorialized in the

report, 'was not inherently inculpatory.' [Citation.] There was no prospect of fabrication or incentive to produce anything other than an accurate description of the state of the body." (*Dungo, supra,* 55 Cal.4th at p. 632 (conc. opn. of Chin, J.), citing *Williams, supra,* 132 S.Ct. at pp. 2228, 2244.)

A majority of the California Supreme Court therefore interprets the *Williams* plurality to mean that a DNA profile report is not necessarily testimonial simply because the defendant had been identified as a suspect when the report was prepared. Instead, according to Justice Chin's concurring opinion in *Dungo,* that is merely a factor to consider when evaluating the circumstances under which reports of forensic test results are prepared.

6.      *The Absence of An Identified Suspect Is Not Required Under the* Williams
        *Plurality's Analysis of the Primary Purpose of DNA Testing*

We agree with Justice Chin's concurring opinion in *Dungo* that the *Williams* plurality did not make the absence of a targeted individual a requirement for finding that a DNA test report is not testimonial. Even though the *Williams* plurality can be plausibly read as limited to situations where no suspect had been identified when a DNA profile was produced, that narrow language actually serves as the jumping off point for a broader interpretation.

As we explained above, the *Williams* plurality said that when the police sent the samples to Cellmark for DNA testing, its primary purpose was to identify and catch the rapist. The same was true for the Cellmark technicians, who could not have known that their test results would point to the defendant or anyone else with a DNA profile in the state's database. However, the plurality then said in essence that the Cellmark technicians who tested the incriminating samples that were later linked to Williams were no different from DNA lab technicians in general, who never know whether their work will incriminate or exonerate someone *whether or not that person has been identified as a suspect or charged with a crime*. (*Williams, supra,* 132 S.Ct. at p. 2244 (plur. opn. of Alito, J.).)

30

The *Williams* plurality elsewhere extolled the virtues of DNA testing in general, noting that its use "to exonerate persons *who have been wrongfully accused or convicted* is well known." (*Williams, supra,* 132 S.Ct. at p. 2228 (plur. opn. of Alito, J.), italics added.) The plurality warned that requiring testimony from the technicians who prepared DNA profiles would encourage prosecutors to forego the use of DNA testing and resort to less reliable forms of identification evidence, an "undesirable development" that the Confrontation Clause did not require. (*Ibid.*) A safeguard for defendants existed because those who "really wishe[d] to probe the reliability of the DNA testing done in a particular case" may always subpoena those who took part in the testing and question them at trial. (*Ibid.*)

Finally, the *Williams* plurality ended by stating that DNA reports prepared by modern accredited laboratories bear little or no resemblance to the kinds of testimonial statements covered by the Confrontation Clause.

If, as Barba contends, the *Williams* plurality is limited to DNA testing conducted only in the absence of an identified suspect, why did Justice Alito contrast that scenario with DNA testing in general, pointing out in broadly favorable language how such testing can exonerate as well as implicate someone already charged with a crime? And why conclude the analysis by stating that DNA testing is essentially exempt from the Confrontation Clause without specifying that this was so only when the test was performed at a time when no suspect had yet been identified? The answer must be – as Justice Chin wrote for a majority of four justices in *Dungo* – that the absence of a targeted individual is not required by the *Williams* plurality in order to find that a DNA test report is not testimonial under the Confrontation Clause.

The practicality of this conclusion is borne out by the facts of this case. Two days after Kim's murder and more than two weeks before an anonymous tipster identified Barba as his killer, lead detective Inabu asked that the bloody knife and sweatshirt found at the scene be tested in order to determine the killer's identity. Under Barba's reasoning, any DNA test results obtained during that period would not be testimonial under the *Williams* plurality. However, once Barba had been targeted as a suspect, reports

31

concerning the results of any testing done after that time became testimonial. The benefits of DNA testing praised by the *Williams* plurality would not simply disappear upon the discovery of a possible suspect. In either case, the same objects would be tested using the same methods by lab technicians who, as Justice Alito observed, have no idea whether their work will exonerate or implicate someone who has been "charged or is under investigation." (*Williams, supra,* 132 S.Ct. at p. 2244 (plur. opn. of Alito, J.).)

7.      *Barba's Confrontation Rights Were Not Violated*

Making sense out of the case law in this area is to some extent an exercise in tasseomancy. The *Williams* plurality believes that DNA reports themselves are not testimonial. A majority of the justices in *Dungo,* as represented by Justice Chin's concurring opinion, reads that opinion to mean that its rationale may apply even if the reports were prepared when a suspect had been identified or charged. Those same four justices concluded that the autopsy report evidence at issue in that case did not violate the Confrontation Clause because it came in through the testimony of the expert witness, who was subject to cross-examination.

Meanwhile, the two post-*Williams* decisions by the Court of Appeal that concern DNA evidence have taken somewhat different approaches. The court in *Holmes, supra,* 212 Cal.App.4th 431, concluded that DNA reports were not testimonial because they lacked the requisite formality and solemnity. (*Id.* at pp. 437-438.) The court in *Steppe, supra,* 213 Cal.App.4th 1116 found no Confrontation Clause violation on facts similar to those here for three reasons: (1) there had already been testimony that the lab would not issue a report unless a reviewer concurred in the analyst's finding, meaning that the jury already knew that the analyst and the reviewer had reached the same conclusion; (2) under *Williams* and *Lopez,* such reports are not formal and solemn enough to be testimonial; and (3) the reviewer's brief reference to the analyst's report and her reliance on the raw data it contained were proper under California law because "such items are reasonably relied on by experts in the field of DNA analysis in forming their opinions."

32

(*Id.* at pp. 1126-1127, citing to *People v. Gardeley* (1996) 14 Cal.4th 605, 618, for the third reason.)

In some ways, the end of this lengthy exposition takes us back to the beginning and the California Supreme Court's decision in *Geier, supra,* 41 Cal.4th 555. Although the *Geier* court used the label "contemporaneous recordation of observable events" to describe why DNA test results were not testimonial (*id.* at pp. 606-607), it did so through the prism of "the circumstances under which [a] statement [was] made." (*Ibid.*)

There were three circumstances that led the *Geier* court to conclude the DNA results at issue in that case were not testimonial. First, the results were generated as part of a standardized scientific protocol conducted pursuant to the analyst's employment at Cellmark. Although the prosecutor hoped to obtain evidence against Geier, the analyst's work product was part of her job, and was not intended to incriminate him. Second, to the extent the analyst's notes and reports recounted the procedures used, they were not accusatory because DNA analysis can lead to either incriminatory or exculpatory results. Third, the accusatory opinions that the DNA evidence matched Geier "were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness, [the lab director]." (*Geier, supra,* 41 Cal.4th at p. 607.)

This reasoning overlaps that of the *Williams* plurality. When determining the primary purpose of an out-of-court statement, the plurality took into account all the surrounding circumstances. Just like the lab technicians who worked on the defendant's samples in *Williams,* DNA lab technicians in general perform their tasks in accordance with accepted procedures and have no idea beforehand whether their work will exonerate or inculpate a known suspect. (*Williams, supra,* 132 S.Ct. at pp. 2243-2244 (plur. opn. of Alito, J.).)

Not addressed by the *Williams* plurality is the *Geier* court's third factor: that the DNA evidence was conveyed through the independent opinion of the DNA expert who testified at trial. This thread is picked up by Justice Chin's concurring opinion in *Dungo*, where he wrote that the autopsy evidence was not testimonial because it came from the expert who testified at trial, and whose opinion was based on the non-accusatory

33

statements about the victim's physical condition that were contained in the report, not from the report itself. (*Dungo, supra,* 55 Cal.4th at p. 632 (conc. opn. of Chin, J.).) Although *Geier's* continued validity has been questioned in light of later United States Supreme Court decisions, it has never been abrogated by the United States Supreme Court, which denied a petition for certiorari in that case just four days after deciding *Melendez-Diaz.* Nor has the California Supreme Court overruled *Geier*, which cited it without qualification in *Lopez, supra,* 55 Cal.4th at pages 576-577, 581, 585.

We therefore arrive at a jurisprudential crossroads. The United States Supreme Court has asked us to reconsider our decision in *Barba III* in light of *Williams*. We believe that a majority of that court would approve of an affirmance here for two reasons. Justice Thomas would approve because DNA reports lack the solemnity and formality required to be deemed testimonial. The plurality would approve because, at least as we read the opinion, DNA test reports are not testimonial in part due to practical considerations, and in part because their primary purpose is not to accuse a targeted individual. The former rationale squares with at least part of our analysis in *Barba III*, where we distinguished the Cellmark DNA reports from the affidavit-like documents at issue in *Melendez-Diaz* and *Bullcoming*. It also aligns with the reasoning in *Holmes, supra,* 212 Cal.App.4th 431 and part of the analysis relied on in *Steppe, supra,* 213 Cal.App.4th 1116.

It appears likely that at least four justices of the California Supreme Court – as represented in Justice Chin's concurring opinion in *Dungo* – would agree that the primary purpose of the DNA test materials produced by Cellmark were not testimonial under the *Williams* plurality's primary purpose test and would reach that conclusion without regard to whether the police had identified a suspect. However, their admissibility would be proper only through the testimony of expert witness Reynolds.

The somewhat competing analyses represented by the *Williams* plurality and the *Dungo* concurrence are almost fully reconciled by the reasoning of *Geier*. The primary purpose of the DNA reports was not testimonial because: (1) they were generated by a lab technician pursuant to standardized procedures; (2) even though Barba had been

34

charged with the crime, lab technicians such as Wong have no idea what their results might show, and DNA testing is routinely used to inculpate or exonerate those charged with crimes; and (3) the accusatory opinions came from expert witness Reynolds, who was subject to vigorous cross-examination.[9]

As for the practical considerations that motivated the plurality in *Williams*, we agree that it makes no sense to exclude evidence of DNA reports if the technicians who conducted the tests do not testify. So long as a qualified expert who is subject to cross examination conveys an independent opinion about the test results, then evidence about the DNA tests themselves is admissible. Finally, as the *Williams* plurality observed, defendants who question the validity of DNA test results have an additional safeguard available through their power to subpoena anyone who took part in the DNA testing process. Accordingly, we hold that Barba's confrontation rights were not violated by Reynolds's testimony.[10]

---

[9] We question whether *Geier's* "contemporaneous recordation of observable events" analysis is viable, given the holdings in *Melendez-Diaz* and *Bullcoming*. Underlying that analysis, however, is a principle that squares with the *Williams* plurality: examining the totality of the circumstances under which a DNA test report was generated. We rely on the latter.

[10] Barba's supplemental brief on *Williams* and its progeny splits time between each of the *Williams* plurality's alternative grounds. We do not believe the first ground – that the reports were not in evidence for their truth – is applicable on the facts of this case. The dispute in *Williams* concerned the expert's testimony that Cellmark's DNA profile from the rape victim's vaginal swabs matched the DNA profile of Williams that the state police obtained in a separate incident. The focus of the argument was on the assumption in the prosecutor's question that the DNA tested by Cellmark in fact came from the victim's vaginal swabs. (*Williams, supra,* 567 U.S. at p. ___, 132 S.Ct. at pp. 2236-2237 (plur. opn. of Alito, J.).)

As Justice Alito pointed out, Justice Kagan agreed in her dissent that there would be no problem asking the expert whether the two DNA profiles matched, without reference to the source of the DNA materials that were tested. (*Williams, supra,* 567 U.S. at p. ___, 132 S.Ct. at p. 2237.) The expert did not testify about anything that was done at Cellmark's lab and did not vouch for the quality of Cellmark's work. (*Id.* at p. 2235.) Instead, the expert was simply making a permissible assumption upon which to base her opinion. (*Id.* at p. 2236.) In this case, however, Reynolds did essentially vouch for the

*8.   Admission of the Reports Was Harmless Error*

Although the plurality opinion in *Williams* could arguably be read to allow DNA reports in evidence without expert testimony, both *Geier* and Justice Chin's concurring opinion in *Dungo* endorsed reference to forensic test reports in part because evidence about them came by way of expert testimony. We need not reach that issue, however, because even if the one DNA report that implicated Barba should not have been allowed in evidence, we conclude the error was harmless. (*People v. Loy* (2011) 52 Cal.4th 46, 69-70 [confrontation clause violations subject to harmless error analysis, where we ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict without the error].)[11]

The report contained nothing remotely approaching a direct affirmation that certain correct procedures had been properly followed. The key defense theory at trial was that the hair samples had been contaminated by the police before being sent to Cellmark, and that Wong's failure to wash the samples explained why Barba's DNA was on the hairs. However, Reynolds was not allowed to speculate about procedures Wong might have performed. Although she could testify about the lab's usual protocols, the jury was told that it did not mean the protocols were followed unless it was reflected in Wong's notes. As a result, Reynolds was forced to concede that Wong had not washed the hair samples that implicated Barba, even though that was usually done in order to eliminate a DNA result from genetic material that had been deposited on the hair shaft.

According to Reynolds, the hair shaft does not contain DNA, but the root does. The shaft was tested separately and was found to have Barba's DNA on it, meaning that it had been deposited there somehow. On direct-examination, Reynolds testified that if the hair had belonged to someone other than Barba, but his DNA had been deposited on

---

accuracy and reliability of Cellmark's DNA testing. Accordingly, we choose not to apply Justice Alito's analysis that evidence from the DNA reports was not admitted for its truth.

[11]   As for the other three Cellmark reports, because they concluded that the samples did not contain Barba's DNA, their admission was also harmless.

36

the hair, then the test results would have shown a mixture – meaning the DNA of two separate persons was present. No mixture was present, she testified. However, on cross-examination, she conceded that she could not rule out the possibility of contamination before Cellmark received the hair samples, and could not say with certainty that the test results came from the hair donor or were deposited there. The report itself noted that in addition to the listed profile results, "weak results" were obtained that could have come from someone else.

In short, even if the report should not have been admitted into evidence, it was virtually meaningless without Reynolds's testimony to explain it. Had the report itself been excluded, Reynolds's opinion would have still been before the jury. Also, the court's order preventing Reynolds from speculating about test procedures that did not appear in Wong's notes allowed defense counsel to perform a skillful and thorough cross-examination that allowed the jury to doubt the reliability of the test results. And, as noted, the report itself stated that weak results were obtained, possibly due to another DNA donor. Finally, the jury did not ask to see the report during its deliberations, and the report was not the focus of the parties' arguments to the jury. We therefore conclude that it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict even if the report had not been admitted into evidence. (*People v. Loy, supra,* 52 Cal.4th at pp. 69-70.)

## II.
## NON-CONFRONTATION CLAUSE ISSUES

1.  *Business Record Foundational Challenges*

Barba also contends the trial court erred by admitting the DNA test results themselves under the business records exception to the hearsay rule (Evid. Code, § 1270)[12] because those results reflected Wong's opinions and were not recording an

---

**12**      All further undesignated section references are to the Evidence Code.

"act, condition, or event." (*People v. Campos* (1995) 32 Cal.App.4th 304, 309.) He also challenges the admissibility of Reynolds's testimony because the prosecution failed to establish two of the statutory predicates under the business records exception: (1) that Reynolds was Cellmark's custodian of records or was otherwise qualified to testify to the report's identity and method of preparation (§ 1271, subd. (c)); and (2) because there was evidence that Wong did not follow the proper testing protocols, the evidence was not sufficiently trustworthy (*id.*, subd. (d)). As to the first, no such objection was raised below and the issue is therefore waived. (§ 353, subd. (a); *People v. Pollock* (2004) 32 Cal.4th 1153.)[13]

Regardless of whether the reports were independently admissible, however, as just discussed, Reynolds was still free to offer an expert opinion based on those reports if they were the proper basis for such testimony. (§ 804, subd. (d); *Geier*, *supra*, 41 Cal.4th at p. 608, fn. 13 [DNA expert witness was free to rely on the analyst's report to form her own opinions about the DNA match]; *People v. Gardeley* (1996) 14 Cal.4th 605, 618.) Because Reynolds could rely on (and be examined about the basis of) those reports, and because Reynolds's independent opinions were the lynchpin of the incriminating DNA evidence, any error in admitting the reports as business records was harmless.

---

[13]    At oral argument upon remand to this court, Barba's counsel said objections about the report were made as "to everything," suggesting to us that an objection had been made under section 1271, subdivision (c). We have reviewed the record and determined that no such objection was made. Were we to reach that issue we would find no error. Reynolds testified that she had a doctoral degree in human genetics, that part of her job duties included performing technical reviews of the lab analysts' case files and independently drawing her own conclusions about the results, that the file Wong prepared was kept in the normal course of business, and that Wong's notes and other records were made at or near the time of the events and were sufficiently detailed that any qualified scientist could interpret them. Accordingly, she did testify to the identity and mode of preparation of the report.

*2.      Claimed Jury Selection Error*

   A.      <u>*Applicable Law and Standard of Review*</u>

Group bias is bias against members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds.  When a prosecutor uses peremptory challenges to strike prospective jurors because of group bias, she violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under both the Fourteenth Amendment to the United States Constitution and article I, section 16 of the California Constitution.  (*People v. Bell* (2007) 40 Cal.4th 582, 596 (*Bell*).)  The federal constitutional right was established by *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and the California counterpart was recognized by *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).  (*Bell*, at p. 596.)  The right applies not only to racial and ethnic minorities, but to gender discrimination as well.  (*People v. Jurado* (2006) 38 Cal.4th 72, 104.)  The defendant need not be a member of the targeted group. (*Bell*, at p. 597.)

When a *Batson-Wheeler* motion is made, the trial court conducts a three-part inquiry.  First, the defendant must make out a prima facie case by showing that the totality of the circumstances gives rise to an inference of discriminatory purpose. Second, if the defendant does so, the burden shifts to the prosecution to adequately explain its peremptory challenges by offering group bias-neutral justifications for the strikes.  Third, if such an explanation has been given, the trial court must decide whether the defendant has proven purposeful discrimination.  (*Bell*, *supra*, 40 Cal.4th at p. 596.)

At the time of trial in August 2004, California's courts had interpreted *Batson*'s requirement of an inference of discrimination to establish a prima facie case to mean a showing of a strong likelihood of discrimination.  (*People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7, disapproved on another ground in *People v Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; *Wheeler*, *supra*, 22 Cal.3d at pp. 280-281.)  In June 2003, our Supreme Court attempted to reconcile the two terms by holding that a prima facie case under *Batson-Wheeler* required a showing that it was more likely than not that group bias had

39

motivated a prosecutor's peremptory challenges. (*People v. Johnson* (2003) 30 Cal.4th 1302 (*Johnson I*).) In *Johnson v. California* (2005) 545 U.S. 162 (*Johnson II*), however, the United States Supreme Court reversed *Johnson I* and held that a prima facie case required no more than evidence or circumstances that gave rise to an inference of discrimination.

Because the trial occurred before *Johnson II* was decided, and because nothing in the trial court's comments indicates that it applied the correct standard, Barba contends, and respondent does not dispute, that we must review the matter de novo, examining the entire record of voir dire to determine the legal question whether the record supports an inference that the prosecutor excused a juror due to prohibited group bias. (*Bell*, *supra*, 40 Cal.4th at p. 597.) We agree.

###### B.    *The* Wheeler *Motion*

Barba's *Wheeler* motion came in response to the prosecutor's 18th peremptory challenge, to prospective Juror No. 61, who was an African-American. Voir dire was initially conducted by the court, with counsel then permitted to ask questions if they wished. The court began its voir dire of Juror No. 61 by greeting him, to which Juror No. 61 replied, "What's up?" Juror No. 61 lived in Hollywood and had worked for Home Depot for five years. He did not know his job title, but was "supposed to do customer service." Juror No. 61 was single, had never been on a jury, and had one year of college education. The prosecutor asked Juror No. 61 no questions, and initially accepted the jury with him on it. After defense counsel exercised her 13th peremptory challenge, however, the prosecutor peremptorily challenged Juror No. 61.

Defense counsel then made her *Wheeler* motion, stating her belief that the prosecutor had earlier challenged another African-American juror and that Juror No. 61 had said nothing to justify a peremptory challenge. When defense counsel claimed that three of the jurors who had voted not guilty at Barba's first trial had been African-American, the court said it did not think that was a factor for it to consider. Defense counsel argued that it "demonstrates that the reason, the only reason she's asked to

excuse juror number 61 is because he's African-American male. Also, I would note that there are no African-American males seated on the jury panel right now, seated in the box right now." The court replied, "All right," and asked defense counsel if she had any other arguments to make. Defense counsel pointed out that a White juror, No. 57, had a background similar to Juror No. 61 but had not been excused by the prosecutor. The court said: "Yeah, I don't find a prima facie case. The prosecution has exercised 17 peremptory challenges. I felt that she has been kicking off people that are both sexes and all races. I don't feel that there is a prima facie case of exclusion of one particular race. I felt that this particular juror whose [sic] being challenged now as to whether or not they were excused, says he's been working at Home Depot for five years. He seemed a little, I don't know, casual in his approach. He greeted the court with a 'what's up.' [¶] Were I trying the case, I don't think I would have kept him, but that's – I don't know. That's not an appropriate consideration for the court, but I just don't see that there is a prima facie case."

Later, during jury deliberations, the court provided counsel with a summary of the racial composition of all prospective jurors who had been peremptorily challenged by both sides, and of the jury that was finally selected to hear the case.[14] The court noted that Juror No. 7, who was the prosecutor's third peremptory challenge, was a dark-skinned man from Honduras that the court perceived was Hispanic and not African-American. Even so, for purposes of its *Wheeler* prima facie analysis, the court considered Juror No. 7 to have been African-American. Of the prosecutor's 17 other peremptory challenges, 9 were Hispanic, 7 were White, and 1 was Asian. Two African-Americans were eventually selected to sit on the jury.

---

[14] We found this summary very helpful and appreciate the trial judge's effort in making a complete record.

## C. *No* Wheeler *Error Occurred*

In determining whether the trial court erred in finding that no prima facie of group bias had been made, we examine the totality of all the relevant circumstances, including the entire record of voir dire of the challenged jurors. However, the other relevant circumstances must do more than indicate that the record would support neutral reasons for the questioned challenges. (*Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1108.) The defense may show that the prosecutor struck most or all of the members of the identified group from the venire or used a disproportionate number of her peremptories against the group. The defendant may also show that the challenged jurors share only one common characteristic -- their group membership -- and in all other respects are as heterogeneous as the community as a whole. The showing may be supplemented when appropriate by such circumstances as the prosecutor's failure to ask the jurors anything other than desultory questions on voir dire, or the failure to ask them any questions at all. (*Bell*, *supra*, 40 Cal.4th at p. 597.)

Barba contends that a prima facie case exists because: (1) the prosecutor had a motive to exclude African-American jurors based on the results of the first trial; (2) jurors with backgrounds similar to Juror No. 61 were allowed to remain; and (3) the prosecutor asked Juror No. 61 no questions. We find no prima facie case.

First, whether the prosecutor might have had a motive does not by itself establish a prima facie case of discrimination. Barba cites no authority for such a proposition and the existence of such a potential motive does not relieve Barba of showing at least some of the permissible factors set forth above when reviewing the trial court's finding that no prima facie case existed. Second, Barba's defense counsel compared Juror No. 61 to just one other juror with a supposedly similar background -- Juror No. 57, who was White. Although Juror Nos. 57 and 61 were both single, they were otherwise dissimilar. Juror No. 61 worked at Home Depot in customer service and had one year of college education, while Juror No. 57 had an AA degree and some postgraduate education and worked as a teaching assistant at a community college. Third, although the prosecutor

42

asked Juror No. 61 no questions after the trial court's initial voir dire, the prosecutor did not question several other prospective White and Hispanic prospective jurors who were peremptorily challenged.[15]  We take this to mean that it was the prosecutor's practice not to question many of the jurors she planned to challenge regardless of their racial or ethnic identities, and it is therefore not indicative of group bias.  Fourth, the prosecutor did not use a disproportionate number of peremptory challenges against African-Americans. Instead, Juror No. 61 was the first and only African-American juror she excused.[16] Finally, the prosecutor agreed to a jury that eventually included two African-American members, which is a factor we may consider.  (*People v. Ward* (2005) 36 Cal.4th 186, 203.)  On this record, we hold that the trial court correctly determined that there was no prima facie showing of a *Wheeler* violation.

3.      *The Phone Tip and Jailhouse Conversation Evidence*

       A.      *The Disputed Evidence and the Parties' Appellate Arguments*

       After obtaining a warrant, the police recorded Barba's jailhouse conversations with various visitors.  Portions of those recordings were introduced in evidence.  The first was a conversation with his sister where she tells Barba that his godfather, David, "got a report."  Barba answers, "I know, I know," then said the report had been shown to "Gordy" and "Abel."  When the sister says she has not seen the report, she asks to see it. Barba then asks whether his godfather talked to her "about that?"  When she says yes,

---

[15]     These were prospective Juror Nos. 17, 28, 34, 45, 49, 58, and 63.

[16]     The trial court decided for purposes of its analysis that it would consider Juror No. 7 – the subject of the prosecutor's third peremptory challenge – to have been African-American, and the parties have argued the issue on that basis.  However, the trial court believed that Juror No. 7, who said he was from Honduras, was in fact Hispanic. Because we review the trial court's order de novo, the trial court's analysis is not binding. Its factual findings concerning a prospective juror's true racial identity are relevant. Regardless, Barba did not contend below and does not contend on appeal that Juror No. 7 was improperly challenged.  In short, we are dealing with a *Wheeler* claim as to only one prospective juror.

Barba says, "The person that . . . when -- I was at the house -- the person he came in with."  When the sister agrees, Barba says, "Had to be.  Had to be."  The following exchange then took place:

> "[The sister]:  Yeah.  I went -- I went over there because I needed brakes.  I went over there, and I saw him.

> "[Barba]:  It had to be.  No other -- no -- there was nobody else.

> "[The sister]:  I know, but Steve [Barba's defense counsel] said that it shouldn't --

> "[Barba]:  Oh, I know because it's -- it's --

> "[The sister]:  -- anonymous.

> "[Barba]:  Yeah, yeah.

> "[The sister]:  So --

> "[Barba]:  But still, though, that -- that -- that -- that --

> "[The sister]:  He's upset -- Gordy is upset about that.[17]

> "[Barba]:  That . . . just jumps, you know?

> "[The sister]:  Gordy is upset about that.

> "[Barba]:  It gave him a green light pretty much.

> "[The sister]:  Not really because you didn't tell him.  As long as -- I don't know, but Gordy - -

> "[Barba]:  The way it went down.

> "[The sister]:  Way after.

> "[Barba]:  I told him.

> "[The sister]:  Way after."

The second was a conversation between Barba and his aunt where she said: "When -- when you want to do -- tell them something, write it down and show it to him

---

**17**    Gordy is Barba's brother.

or he writes and -- it to you here. And that's it. Don't -- about anything, okay." Barba replied, "No, well, about that, no one."

The third was a conversation with a woman named Karla where Barba said, "I know I got everybody behind me, you know? I know that already. I just feel like, damn, I fucked up. It's like I let everybody down."

These conversations were admitted on the theory that they were adoptive admissions by Barba. (§ 1221.) In connection with this evidence, the court allowed a police detective to testify about the anonymous phone tipster who identified Barba as Kim's killer. The court instructed the jury that the phone tip evidence was not to be considered for the truth of the tipster's statement, but was to be used solely in order to explain subsequent actions by the police and to explain the context of Barba's jailhouse conversations.

In his opening appellate brief, Barba contends the trial court erred by admitting evidence of the anonymous phone tip because it was inadmissible to explain subsequent conduct by the police in response to the tip. (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.) He contends the jailhouse conversations were not admissible as adoptive admissions because there was no showing that he knew of the contents of the anonymous call when his conversations were recorded. (*People v. Maki* (1985) 39 Cal.3d 707, 712.) The conversation where he told his sister he had "fucked up" and "let everybody down" was not admissible, Barba contends, because it is not a clear admission of anything and bears no relationship to the anonymous phone tip. Respondent conceded in its brief that the phone tip was not admissible to explain later actions by the police and that the three jailhouse conversations did not qualify as adoptive admissions. According to respondent, evidence of the phone tip was admissible for a nonhearsay purpose on the alternate ground that it explained the jailhouse conversation concerning an anonymous report, and that all three conversations were admissible on a ground not raised at trial: they qualified as hearsay exceptions because they were statements of a party. (§ 1220.)

In his reply brief, Barba renews his attack on the admissibility of the phone tip to explain police conduct, but does not address respondent's contention that the evidence

45

was properly admitted to give context to at least one of his jailhouse conversations. He does, however, renew his contention that there was no showing he knew of the phone tip when his conversations were recorded. He also contends that respondent cannot attempt to justify admission of the jailhouse conversations under section 1220 because that issue was not raised below, and that allowing the jailhouse conversations and phone tip into evidence violated his constitutional witness confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36.

B.      *The Phone Tip Evidence Was Properly Admitted*

The anonymous phone tip evidence was admitted in part for a nonhearsay purpose: to give context to Barba's jailhouse conversations. It was therefore admissible on that basis and did not violate his constitutional witness confrontation rights. (*People v. Turner* (1994) 8 Cal.4th 137, 189-190, overruled on another ground by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5, overruled on another ground in *People v Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32; *People v. Cooper* (2007) 148 Cal.App.4th 731, 747.) Because Barba referred to an anonymous report in his conversation with his sister, as well as to some other person he talked to about "[t]he way it went down," we reject his contention that the prosecution failed to show he knew about the anonymous phone tip at the time of that conversation. In any event, if error occurred at the time the evidence was admitted because the prosecution failed to make that foundational showing, it was rendered harmless because the jury was instructed that in order to consider the jailhouse conversations as adoptive admissions, it first had to find that Barba knew about the phone tip.

C.      *The Jailhouse Conversations Were Properly Admitted*

Even if the trial court erred by admitting the jailhouse conversations in evidence as adoptive admissions, we will find no error if the evidence was admissible under section 1220. (*People v. Horning* (2004) 34 Cal.4th 871, 898.) Under that section, "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered

46

against the declarant in an action to which he is a party. . . ." (§ 1220.)  In order to qualify under section 1220, the statement does not have to be an admission, and the section covers all statements by a party.  (*Horning*, at p. 898.)  If a party has made an out-of-court statement that is relevant and not excludable as unduly prejudicial under section 352, the statement is admissible under section 1220.  (*People v. Castille* (2005) 129 Cal.App.4th 863, 875.)[18]  All three jailhouse conversations meet this standard.[19]  To the extent those statements might be considered ambiguous, that affected only the weight to be accorded the evidence, not its admissibility.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1122, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151, which was disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

## DISPOSITION

The judgment is affirmed.


RUBIN, J.

I CONCUR:


BIGELOW, P. J.

---

[18]     Barba's trial counsel objected that the anonymous phone tip evidence was unduly prejudicial under section 352, but did not make the same objection as to the jailhouse conversations.  On appeal, Barba did not renew the section 352 objection.

[19]     The statement that Barba knew he "fucked up" and "let everybody down" could be interpreted as an acknowledgement of wrongdoing.  We have some concerns about the conversation where Barba indicates he will write down things he wants to say, rather than speak them out loud.  The prosecution contended this showed a consciousness of guilt, while the defense contended it was ambiguous and might have reflected nothing more than defense counsel's instructions to say nothing about the case.  If error occurred in admitting this one statement, it is frankly so ambiguous that its admission was harmless.

*People v. Barba*
**B185940**

**J. Flier, Concurring**

I concur in the judgment because *People v Lopez* (2012) 55 Cal.4th 569 and *People v. Dungo* (2012) 55 Cal.4th 608 require finding the admission of Dr. Reynold's testimony did not violate the Confrontation Clause.

FLIER, J.

1