Filed 5/28/14  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048388 |
| v. | (Super. Ct. No. 10CF1295) |
| DANIEL PEREZ GONZALEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed.

Wallin & Klarich and Stephen D. Klarich for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Daniel Perez Gonzalez of forcible rape (Pen. Code § 261, subd. (a)(2); count 1),[1] forcible sodomy (§ 286, subd. (c)(2); count 2), forcible oral copulation (§ 288a, subd. (c)(2); count 3), forcible penetration with a foreign object (§ 289, subd. (a)(1); count 4), second degree robbery (§§ 211 and 212.5, subd. (c); count 5), and simple kidnapping (§ 207, subd. (a); count 6). The jury found that in the commission of counts 1, 2, 3, and 4, under circumstances in which he had kidnapped the victim (§ 667.61, subd. (e)(1)), defendant personally used a dangerous and deadly weapon (§ 667.61, subd. (e)(3)). In a bifurcated proceeding, the trial court found that defendant had four previous qualifying convictions under section 667.5, subdivision (b). The court sentenced defendant to 57 years to life in state prison. On appeal, defendant contends the court improperly admitted expert testimony without foundation and in violation of defendant's confrontation clause rights. We affirm.

FACTS

*Percipient Witness Testimony*

On the morning of December 22, 2009, K. was working as a prostitute on a street corner in Santa Ana. K. approached a van and talked to a man inside the van. K. did not identify defendant as the man in the van, but other evidence supports a finding that this man was defendant. K. climbed in the van and directed defendant to drive to another location. While driving, defendant agreed to pay K. $50 for oral sex. Defendant parked the car at the location prescribed by K. and climbed into the back seat with her. Defendant then reached for a knife in his side pocket, and struck K. several times above her right eyebrow. He then pressed the blade of the knife against K.'s neck and told her not to scream or else he would slit her throat.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

After demanding K.'s money, defendant laid K. down in the back seat of the van and forcibly removed her pants. Defendant took K.'s pants, car keys, and cell phone, and then climbed into the front seat and began driving to another location. Defendant again told K. he would kill her if she tried to get away. After arriving at a new location, defendant returned to the back seat with K. and removed her top with the knife still in his hands. When defendant found money in K.'s bra, defendant yelled at K. and then forced her to orally copulate him. K. complied because she feared for her life. Later, defendant demanded vaginal sex, at which point K. requested that defendant retrieve a condom from her jacket. Defendant then put the condom on and engaged in vaginal intercourse with K. Defendant subsequently forced K. onto her stomach and inserted his finger into her anus. Defendant then inserted his penis and performed anal sex on K. At some point during the series of events, defendant was no longer wearing the condom.

When defendant was finished, he told K. to give him her shoes, and told her he would return her belongings once she exited the van. Defendant drove away once K. exited the van, leaving her naked on the side of the road without her belongings. A witness saw K. standing naked on the side of the road and crying a few minutes later; the witness called 911. The 911 call was played for the jury. The witness reported that K. had been raped in a "maroon van" by "a Mexican guy." The witness stated K. was "really traumatized" and "naked." The phone was handed to K., who stated on the 911 call that the perpetrator "had a knife to my neck and he said if I squealed he'd slit my throat." K. admitted she was a prostitute on the 911 call.

When defendant was contacted by police in May 2010, there was a maroon van at the location. The description of the interior of the van provided by K. was consistent with a police officer's inspection of the van at defendant's residence. The defense did not call any witnesses.

3

*Expert Witness Testimony*

After police arrived on the scene, K. was taken to the hospital. A forensic sexual assault nurse examiner (who testified at trial) performed a sexual assault examination of K. The examination revealed lacerations to K.'s anus consistent with her report of nonconsensual digital penetration and sodomy. The nurse took a blood card sample from K. so as to establish her DNA profile. The nurse also took swabs from K.'s vulva, vagina, anus, and rectum in an attempt to collect the perpetrator's DNA. The nurse dried, individually packaged, and labeled the swabs; she then gave all of the forensic evidence to a Santa Ana police officer. The officer (who also testified) transported the evidence to the police department and stored it in the locked evidence freezer.

Matthew Nixt, senior forensic scientist with the Orange County crime lab, was the case manager for this matter and testified as an expert witness in this case. According to Nixt, the evaluation of potential DNA evidence at the lab follows a standard protocol: (1) evidence examination and evaluation; (2) extraction of DNA from the sample; (3) quantitation of DNA; (4) amplification of DNA; (5) capillary electrophoresis; and (6) interpretation of the results.

Nixt personally performed the preliminary assessment test that revealed the presence of semen in the swabs, from which DNA samples were extracted and processed by other technicians. Six other crime lab employees participated in the processing of the samples, though only Nixt interpreted the results and only Nixt testified at trial. Nixt has performed each of the intermediate steps many times in the course of his employment. He is familiar with each of the steps. The crime lab employees maintain records making it clear who performed which tasks, but the records are not formalized in an affidavit. Nixt was not asked by either counsel to identify by name any of the other employees who participated in the testing process.

An irregularity occurred during the DNA extraction processing of one of the six control sample tests performed on K.'s swabs. A "tube-to-tube contamination" had occurred in one of the negative controls, contaminating the sample with a female DNA profile. The lab runs "negative controls with all of our extractions. The point of the negative control is to monitor our reagents, to make sure that our stock bottle of reagents that we're using are not somehow . . . contaminated with D.N.A. from a source, and . . . to monitor the specific extraction being performed to see if any cross-contamination or sample-to-sample, tube-to-tube contamination could have occurred." The profile of the contamination DNA matched the DNA profile from K.'s blood card reference sample. The technical leader at the lab was notified of the contamination pursuant to an established protocol at the lab; she determined that the contamination was not important enough to stop processing of the samples. No other irregularities occurred during the testing process.

In March of 2010, defendant was identified as a suspect after the DNA from K.'s swabs was found to have matched defendant's DNA profile. Police contacted defendant in May of 2010 to obtain a DNA sample by way of a buccal (i.e., cheek) swab. This sample was sent to the Orange County crime lab to be compared against the DNA samples extracted from K.'s swabs. When Nixt received the "reference sample" taken from defendant, the case numbers on all of the packaging matched the case at hand, but the external packaging was labeled "David Gonzalez" while the internal packaging was labeled "Daniel Gonzalez."

After defendant's reference sample was processed, Nixt determined that the DNA profile obtained from K.'s rectal swab was "the same as" the DNA profile taken from defendant's reference sample. "The frequency of choosing an individual at random who would have that profile is more rare than one in one trillion unrelated individuals." The DNA profile obtained from K.'s anal swab was the same as the defendant's reference sample, though the swab also contained a female DNA profile assumed to be K.'s. The

5

frequency estimate on this sample was also "rarer than one in one trillion unrelated individuals." Nixt further determined that the DNA sample from K.'s vaginal swab contained a female profile assumed to be K.'s along with a "minor male profile," and defendant could not be eliminated as potentially the minor contributor. The frequency estimate for the male profile in the vaginal swab was also "more rare than one in one hundred million unrelated individuals."

At trial, counsel for defendant objected to Nixt's testimony regarding the DNA evidence, citing a lack of foundation, multiple levels of hearsay, and a violation of the confrontation clause as explained in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*). The court overruled these objections.

## DISCUSSION

*Nixt's Testimony Had Sufficient Foundation*

Defendant first contends the court abused its discretion under the Evidence Code by admitting Nixt's expert testimony. Defendant claims Nixt "was not able to establish certain preliminary facts necessary to the admissibility of the biological evidence in issue, to wit: whether other technicians who processed the evidence in question did so properly, whether errors in the processing of the evidence had been properly corrected, and whether the sample purporting to be [defendant's] sample did, in fact, belong to" defendant. Citing Evidence Code section 403, subdivision (a)(4), defendant notes, "Perhaps the cause of the errors here was of no significance; however, one cannot be satisfied of such a conclusion unless we know how the analyst in issue 'comported' himself or herself and what caused the errors and that the errors were corrected."

"The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is

6

inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when:"  "(4) The proferred evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself."  (Evid. Code, § 403, subd. (a).) "We review a trial court's ruling on the sufficiency of the foundational evidence under an abuse of discretion standard." (*People v. Tafoya* (2007) 42 Cal.4th 147, 165.)

The court did not abuse its discretion.  Between Nixt (the case manager in charge of the DNA testing concerning K. and defendant), the forensic nurse, and police officer testimony, the prosecution introduced sufficient evidence to establish the swab samples were taken from K. and defendant.  These witnesses also established evidence sufficient to support a proper chain of custody in the handling and delivery of K.'s and defendant's samples.  Nixt's testimony detailed the standard procedures followed by the crime lab in testing samples for DNA and the quality control checks in place to ensure errors in processing do not occur.  That someone wrote the wrong first name on the outside of defendant's sample does not change the testimony establishing that defendant's sample was taken from him and delivered to the crime lab, or that the proper last name and case numbers were on the inside and outside of the evidence packaging.[2] With regard to the tube-to-tube contamination in a control sample, the identification of this mishap by Nixt in his testimony showed the crime lab maintained its own quality control procedures.  This testimony had nothing to do with Nixt's conclusions about the results of the DNA testing on the samples with actual sperm extracted from K.'s swabs. The court did not abuse its discretion in concluding Nixt had sufficient foundation to testify about the results of the DNA testing.

---

[2]    At the preliminary hearing, a detective in charge of investigating the case testified that defendant was also known as David Gonzalez.  This may explain the error in writing David rather than Daniel on the sample.

7

*Nixt's Testimony Did Not Violate Defendant's Confrontation Clause Rights*

Relatedly, defendant argues that the admission of Nixt's testimony violated defendant's right to confront adverse witnesses — namely, the other crime lab employees who participated in the DNA testing at issue in this case. We disagree.

"[G]enerally the Sixth Amendment's confrontation right bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination." (*People v. Lopez* (2012) 55 Cal.4th 569, 580-581.) Both our Supreme Court and the United States Supreme Court have recently wrestled with the application of this principle to the context of scientific testing and expert testimony. (See *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221]; *Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct 275]; *Melendez-Diaz, supra*, 557 U.S. 305; *People v. Dungo* (2012) 55 Cal.4th 608; *People v. Rutterschmidt* (2012) 55 Cal.4th 650; *People v. Lopez, supra*, 55 Cal.4th 569.)

The question here is whether Nixt relayed testimonial statements from his fellow crime lab workers in violation of the confrontation clause or, alternatively, provided admissible expert testimony about the results of non-testimonial DNA testing. "To be considered testimonial, the out-of-court statement (1) must have been made with some degree of formality or solemnity; and (2) must have a primary purpose that pertains in some fashion to a criminal prosecution." (*People v. Barba* (2013) 215 Cal.App.4th 712, 720-721 (*Barba*); see *People v. Holmes* (2012) 212 Cal.App.4th 431, 438 (*Holmes*) ["It is now settled in California that a statement is not testimonial unless both criteria are met"].)

Applying this framework, it does not necessarily violate the confrontation clause for expert witnesses who have supervised but not performed the underlying laboratory work to testify about the results of DNA testing. (*Holmes, supra*, 212 Cal.App.4th at pp. 433-434.) The testifying witnesses in *Holmes* "referred to notes, DNA

8

profiles, tables of results, typed summary sheets, and laboratory results that were prepared by nontestifying analysts." (*Id*. at p. 434.) "None of these documents was executed under oath. None was admitted into evidence. Each was marked for identification and most were displayed during testimony. Each of the experts reached his or her own conclusions based, at least in part, upon the data and profiles generated by other analysts." (*Ibid*.) The *Holmes* court concluded the test data and reports were not sufficiently solemn or formal to qualify as testimonial because they consisted of "unsworn, uncertified records of objective fact." (*Id*. at p. 438.) Though the court noted the data and reports were generated for the primary purpose of a criminal prosecution, this alone was not enough to render the DNA test data testimonial. (*Id*. at p. 438; see also *Barba*, *supra*, 215 Cal.App.4th at pp. 741-743 [DNA report relied on by testifying expert in forming opinions not testimonial because it both lacked the necessary formality or solemnity, and because its primary purpose did not pertain to a criminal prosecution].)

In the instant case, Nixt was involved in the DNA testing process from the beginning to the end. Nixt was the only crime lab employee to evaluate the evidence at the beginning of the process and the only crime lab employee who reached conclusions about the results of the testing. The test results referred to and relied on by Nixt were simply printouts of raw data produced by lab tests performed by various technicians. There was no formal document (such as an affidavit or certificate) from the non-testifying technicians; nor did non-testifying lab employees state conclusions in a final report or other document. Instead, Nixt himself signed a report at the end of the process indicating his conclusions and stating he was the author of those conclusions. It does not appear that the prosecutor attempted to introduce any of the raw data or the final report into evidence. There are certainly no documents in the appellate record for this court to examine. Defendant is left to suggest that data generated by and procedures followed in the intermediate steps of the crime lab's process (on which Nixt relied to form his conclusions) are testimonial.

9

In sum, defendant's assertion of a confrontation clause violation is a nonstarter. "Unsworn statements that 'merely record objective facts' are not sufficiently formal to be testimonial." (*Holmes*, *supra*, 212 Cal.App.4th at p. 438.) "So long as a qualified expert who is subject to cross-examination conveys an independent opinion about the test results, then evidence about the DNA tests themselves is admissible." (*Barba*, *supra*, 215 Cal.App.4th at p. 742.) "Defendant cites no authority that testimony concerning raw data, by an expert subject to cross-examination, violates the Confrontation Clause." (*People v. Steppe* (2013) 213 Cal.App.4th 1116, 1126 [another case rejecting confrontation clause challenge to expert testimony regarding DNA testing].) Because we reject defendant's assertion of confrontation clause error on the first prong of the analysis, we need not address the closer question of whether the primary purpose of some or all of the DNA testing pertained to a criminal prosecution.

DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


FYBEL, ACTING P. J.


THOMPSON, J.