Filed 8/28/15  P. v. Romero CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BERNARDO ROMERO, <br><br> Defendant and Appellant. | B258478 <br><br> (Los Angeles County <br> Super. Ct. No. BA154476) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne Egerton, Judge.  Affirmed.

Jennifer Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

In 2014, defendant Bernardo Romero was charged with the 1997 stabbing murder of Israel Cervantes (Pen. Code, §§ 187, subd. (a)),[1] along with a deadly weapon enhancement (a knife) (§ 12022, subd. (b)). A jury found him not guilty of first or second degree murder, convicted him of the lesser offense of voluntary manslaughter (§ 192, subd. (a)), and found the weapon enhancement true. He was sentenced to the upper term of 11 years, plus one year for the weapon enhancement.

On appeal, he argues his confrontation rights were violated when the trial court admitted diagrams and photographs from Cervantes's autopsy and evidence of Cervantes's blood alcohol concentration through a medical examiner who had not examined Cervantes's body in 1997. He acknowledges we must reject his argument in light of *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) and *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), but seeks to preserve this issue for further review. He also challenges the imposition of the upper term sentence for voluntary manslaughter. We affirm.

## STATEMENT OF FACTS

According to her trial testimony, on the night of May 21, 1997, Inez Ortega was working as a cashier and bartender at the El Paso bar in downtown Los Angeles. Appellant was there with two other people. He had consumed up to 10 beers that night. Ortega observed that the "skinnier" one of appellant's companions had a knife clipped to his belt. Cervantes arrived and began playing billiards. He was not drinking.

At around 9:30 p.m., an African-American woman entered the bar and asked appellant and his companions for a cigarette. Appellant responded he had none. Cervantes interjected and told appellant to give the woman a cigarette. Appellant responded to Cervantes that he did not have any and said, "You're going to pay for that outside." Appellant did not appear to be upset, however. Shortly thereafter, appellant became angry and got into an argument with Cervantes. Ortega stepped between them and asked appellant and his companions to leave. She told Cervantes to wait before leaving to avoid more problems. A "good while" later, Cervantes left. Minutes later, he reentered the bar,

---

[1]     Undesignated statutory citations are to the Penal Code unless otherwise noted.

2

bleeding from his abdomen and "holding on to himself." He said, "They fucked me up." He fell onto Ortega and she laid him on the floor face-down. She looked out the door and saw appellant holding a knife. He made a stopping motion with his hand that Ortega interpreted as a threat.

Ortega's statement to the police on the night of the incident somewhat varied from her account at trial.[2] She told officers Cervantes entered the bar, spoke with appellant and his companions, then walked to the back of the bar. She told Cervantes to leave because the owner of the bar did not like him and told her not to serve him. He placed quarters on the pool table to play and was drinking a beer. A few minutes later, an African-American woman entered and grabbed a pack of cigarettes from appellant and his companions. One of them grabbed her wrist, and Ortega told him to let her go. The man released her and she left the bar. During the incident, Cervantes approached appellant and his companions and asked if they would buy him a beer because he was from "18th Street" (an apparent gang reference). The taller of the three men responded that he was from "18th Street." They started arguing and Ortega told them to leave. All four individuals exited the bar, continuing to argue. Then Ortega saw Cervantes run and heard a bottle break. A few seconds later, Cervantes reentered the bar, bleeding from his stomach. He said something, but Ortega could not recall what. She did not see who stabbed him. She helped him out onto the sidewalk and called the police.

When asked at trial about her 1997 statements, Ortega confirmed she had asked Cervantes to leave because he was banned from the bar and he responded he would leave soon. She denied seeing the African-American woman take a pack of cigarettes from appellant or his companions, seeing someone grab her wrist, or hearing Cervantes ask appellant and his companions to buy him a beer. She also denied hearing Cervantes claim he was from the 18th Street gang. And she denied telling the police all four individuals left at the same time.

---

[2]     Ortega had suffered two strokes between the stabbing and the trial.

3

Rosa Diaz owned the El Paso bar in 1997. After the stabbing, Ortega called her and she arrived minutes later. Police were present, but Cervantes's body was no longer at the scene. Ortega told her the incident started when a woman entered asking for a cigarette. Cervantes became upset because some men in the bar were disrespectful to her. He stayed and played pool. When he left, the men who had disrespected the woman were waiting outside. Diaz explained she had not banned Cervantes from the bar but told Ortega to be careful because he was "not a good person."

Deputy Medical Examiner Job Augustine testified for the prosecution. He did not conduct the autopsy on Cervantes, but reviewed four autopsy diagrams and five photographs from the 1997 file, all of which were admitted at trial without objection. Based on the diagrams and photographs, Augustine testified Cervantes suffered blunt force and sharp force trauma: one potentially fatal stab wound to his back; one nonfatal stab wound to his rib area; one fatal stab wound penetrating his heart; and one incised wound to his head consistent with being hit by a glass bottle.[3] Cervantes also had facial injuries consistent with falling on his face without putting his hands out to protect himself from injury. He had no wounds or bruises on his hands.

Augustine also reviewed a toxicology panel done at the time of the autopsy, although it was not admitted into evidence. He testified Cervantes's blood alcohol concentration (BAC) was between 0.2 and 0.23 grams percent, although there could have been a dilutional effect because Cervantes was deceased.

Los Angeles Police Officer Steve Koman investigated Cervantes's death in 1997. He obtained photographs of appellant and the other suspects, including Marceleno Lopez, appellant's cousin. He prepared a photograph six-pack lineup with appellant's photograph

---

[3] The diagram depicting this head wound labeled it as a "stab" wound, but Augustine believed that was "technically . . . incorrect" and considered it an "incised" wound because it was longer than it was deep.

4

and showed it to Ortega, who identified appellant as involved in the altercation.[4] Koman attempted to locate appellant and the other suspects, but learned they had fled to Mexico.

Appellant was arrested in 2013 outside of Philadelphia, Pennsylvania. When interviewed by officers, he initially gave another name, claimed he had "passed by" Los Angeles three or four years prior, and denied living there in 1997. Appellant also denied recognizing himself in the photographic six-pack lineup. Appellant eventually admitted he had knowledge of the 1997 stabbing. He claimed he was calmly playing pool in the bar when Cervantes began to beat him up. He went to the restroom and Cervantes followed, continuing to beat him. Appellant initially denied beating Cervantes, but later admitted he and his cousin hit him. He denied having a knife and denied stabbing Cervantes. He explained his cousin took Cervantes outside and they fought. Appellant simply watched and ran off with his cousin after the altercation. He did not know if his cousin stabbed Cervantes. He did not refute a statement from a relative that he was "very nervous" and "appeared agitated" the night of the stabbing, and he packed his belongings and said he had to leave but could not say why. Despite his earlier statements, however, appellant eventually admitted stabbing Cervantes. He claimed the knife was given to him by another individual inside the bar, who said, "Here, take this so you can defend yourself." Once outside, his cousin hit Cervantes in the head with the bottle and appellant stabbed him, claiming it was "easy."

Appellant testified in his own defense. At around 9:00 p.m. on the night of the stabbing, he was at the bar with four or five friends and consumed about 10 beers. Cervantes arrived at 9:30 p.m. A Black woman entered and wanted to take some of their cigarettes, but appellant and his friends did not let her. She snatched the cigarettes off the table, but Cervantes stopped her. Cervantes called the group "idiots," and started to yell and say he was a gang member. Later, Cervantes hit appellant in front of his friends, then followed appellant into the bathroom and hit him more. The argument continued near the

---

[4]     Ortega was again shown the six-pack photographic lineup in 2013 and identified appellant.

5

pool table, where appellant's friends got involved. Appellant felt he could not defend himself because Cervantes was physically larger. Appellant's friends told Cervantes to calm down or leave, but he would not. He seemed intoxicated. He claimed he was in a gang, and appellant and his friends feared more of his fellow gang members might show up. Appellant admitted one of his friends had a knife on his belt. Appellant felt "tormented" and "angry."

Ortega told them all to leave the bar, and they all left at the same time. Appellant apparently came outside slightly later because by the time he exited the bar, the "other guys" had already beaten Cervantes and appellant's cousin had hit him in the head with a bottle. Cervantes wanted to hit appellant and started "yanking" him around. One of the individuals gave appellant the knife and told him to defend himself with it. Appellant stabbed Cervantes because "I was drunk. I was really angry. My adrenaline, it was just, like, way up. And at the end, well, as I said, I kind of lost my head. I didn't know what I was doing anymore."

Appellant left the scene because he was scared and had never interacted with the police before. He was also afraid because Cervantes claimed to be a gang member. He left Los Angeles a week later because he heard the police were looking for him. He was arrested 16 years later in Pennsylvania following a drunk driving accident.

He admitted lying to police at certain points in his 2013 interview and that he attempted to shift blame to his cousin. He denied waiting inside the bar "plotting [his] revenge" or waiting outside for Cervantes to exit.

In rebuttal, appellant's aunt testified he had been living with her and his uncle in 1997. One night in May 1997, he came home "nervous," had gotten a haircut, and said he was leaving, which surprised her. He did not tell her where he was going or why. She did not see him again until trial.

## DISCUSSION

### 1. Confrontation Clause

Relying on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), appellant contends his Sixth Amendment confrontation rights were violated when the court admitted

6

diagrams prepared during Cervantes's autopsy and allowed Augustine to testify to Cervantes's BAC results, given Augustine did not perform the autopsy or BAC analysis. The confrontation clause bars the admission of testimonial statements made outside of court against a defendant unless the declarant is unavailable at trial and the defendant had a prior opportunity for cross-examination. (*Lopez, supra,* 55 Cal.4th at pp. 580-581; *People v. Barba* (2013) 215 Cal.App.4th 712, 721 (*Barba*).) In *Barba*, this division discussed in detail the recent case law addressing the intersection of the confrontation clause and forensic evidence, including *Lopez* and *Dungo*. (See *Barba, supra*, at pp. 722-731.) We need not repeat that analysis here. Appellant concedes his contentions are foreclosed by *Lopez* and *Dungo*, but contends those decisions were wrongly decided. We are bound by those decisions, so we reject his claims.

*A. Procedural Background*

As noted above, Deputy Medical Examiner Augustine testified about Cervantes's autopsy and his BAC, although he did not conduct the autopsy or BAC analysis. He explained the original examiner, Dr. Erlich, was no longer with the coroner's office and he did not know if she had retired. Through Augustine, the prosecutor offered into evidence four autopsy diagrams signed by Dr. Erlich (and potentially a supervisor), which contained objective observations of the condition of Cervantes's body and measurements and placement of his wounds. None of them contained any conclusions from Dr. Erlich, such as whether the wounds were fatal. The prosecutor also offered five photographs of Cervantes's wounds. Based on the diagrams and photographs, Augustine offered his opinion that at least one of Cervantes's stab wounds was fatal and another was potentially fatal. As for Cervantes's BAC, the prosecutor did not offer any documentary evidence of the analysis, but elicited from Augustine that a toxicology panel was done, which yielded measurements of 0.2 grams percent in a sample of blood around his heart and 0.23 grams percent in a sample of femoral blood. Augustine noted there could have been a dilutional effect because Cervantes was deceased when the samples were taken.

7

*B. Forfeiture*

Appellant never objected to any of this evidence in the trial court, so he forfeited his confrontation claims. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19; but see, e.g., *People v. Pearson* (2013) 56 Cal.4th 393, 461-462 [finding no forfeiture of *Crawford* claim arising in trial conducted eight years *before Crawford* was decided].) Implicitly recognizing his forfeiture problem, appellant contends his trial counsel was ineffective for failing to object. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*); see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) As appellant concedes and we will explain, we must reject his claims in light of *Lopez* and *Dungo*, so his counsel was not deficient for failing to raise a futile objection below. (*People v. Price* (1991) 1 Cal.4th 324, 387.)

*C.* Dungo *and the Autopsy Diagrams*

In *Dungo*, the defendant was convicted of murder. A prosecution forensic pathologist testified the victim had been strangled based on objective facts concerning the condition of the body as observed by another pathologist and recorded in an autopsy report and accompanying photographs. The report itself was not admitted into evidence. (*Dungo, supra*, 55 Cal.4th at p. 612.) As we explained in *Barba*, the court found the portions of the report conveyed by the testifying pathologist were not testimonial: "First, the expert testified as to only the physical observations recorded in the autopsy report, not as to the conclusions reached by the pathologist who conducted the autopsy and prepared the report. Such observations lack the formality required under the Confrontation Clause. [Citation.] [¶] Second, the court held that autopsy reports do not have the primary purpose of targeting an accused individual. Autopsy reports are required by law for certain types of deaths— some related to criminal activities and some not. [Citation.] Such reports therefore serve many purposes: to allow a decedent's family to learn whether a wrongful death action is

8

warranted; for insurance companies to determine whether a death is covered under one of its policies; and to provide answers to grieving family members or satisfy the public's interest in the death of newsworthy persons. [Citation.] Although autopsy reports are sometimes prepared for criminal investigations, their primary purpose is to provide an official explanation for an unusual death. Such official records are not ordinarily testimonial." (*Barba, supra*, 215 Cal.App.4th at p. 730, citing *Dungo, supra*, at pp. 619-621.)

*Dungo* plainly defeats appellant's challenge to the admission of the autopsy diagrams here. As *Dungo* held, the autopsy was not testimonial because it was not conducted for the primary purpose of targeting an accused individual, but rather to provide an official explanation of Cervantes's death. Likewise, the autopsy diagrams contained only physical observations and measurements, not Dr. Erlich's conclusions, so they were not sufficiently formal and solemn to be considered testimonial.

Although the four diagrams here were admitted into evidence, whereas the autopsy report in *Dungo* was not, that does not change their nontestimonial nature. In *Dungo*, the court drew a distinction between two types of statements in an autopsy report: "(1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death." (*Dungo, supra*, 55 Cal.4th at p. 619.) It emphasized that the case involved only the first category, which were "less formal than statements setting forth a pathologist's expert conclusions." (*Ibid.*) Because the report had not been admitted, the court did not have to decide "whether that entire report is testimonial in nature," and because the testifying pathologist did not describe any conclusions from the report, the court did not need to "determine whether such testimony, if it had been given, would have violated defendant's right to confront [the nontestifying pathologist]." (*Ibid.*) The four diagrams in this case set forth only objective observations about Cervantes's body and Augustine did not testify as to any of Dr. Erlich's conclusions after conducting the autopsy on Cervantes. Thus, even though the four diagrams were admitted into evidence, they fall squarely within *Dungo*'s description of nontestimonial statements. (See *People v. Ford*

9

(2015) 235 Cal.App.4th 987, 996-997 [rejecting similar distinction under *Dungo* in case involving admission of redacted autopsy report].)

*D.* Lopez *and the BAC Analysis*

In *Lopez*, the defendant was found guilty of vehicular manslaughter while intoxicated. A lab report was admitted into evidence showing the defendant's blood alcohol level was 0.09 percent. (*Lopez, supra*, 55 Cal.4th at p. 574.) The author of the report did not testify, but a sheriff's department criminalist testified he had reviewed the lab report and, based on his own abilities, he independently concluded the defendant's blood alcohol level was 0.09 percent. (*Ibid.*) He also testified he had been employed at the laboratory for more than 17 years, knew its procedures for processing blood samples for alcohol analysis, had trained the analyst who actually tested the blood, and was "'intimately familiar'" with the procedures the analyst used. (*Ibid.*) As we explained in *Barba*, the court in *Lopez* found the report was not testimonial: "[T]he portions of the lab report that contained nothing other than the machine-generated results of the test performed were not sufficiently formal or solemn to be testimonial under the Confrontation Clause because they lacked any attestations or assertions of validity, and because there was no way to cross-examine the machine that generated those results. [Citation.] The same was true as to the portions of the report that functioned like a chain of custody report by showing that it was the defendant's sample being tested. Those notations, on a chart captioned 'FOR LAB USE ONLY,' were instead nothing more than an informal record of data for internal purposes." (*Barba, supra*, 215 Cal.App.4th at p. 729, citing *Lopez, supra*, at pp. 582-584.)

Unlike the BAC report in *Lopez*, we have no information about the documentation of the BAC results in this case. Augustine simply testified as to the final result of the BAC testing. In the absence of any suggestion that the BAC analysis contained more than machine-generated results or had any attestations of validity, we must conclude the BAC evidence was insufficiently formal or solemn to implicate the confrontation clause.**[5]**

---

**[5]** Appellant attempts to distinguish *Lopez* by arguing Augustine did not have the same experience with testing procedures as the analyst had in *Lopez*. But Augustine's

10

## 2. *Upper Term for Voluntary Manslaughter*

### A. *Procedural Background*

Prior to sentencing, appellant submitted a written sentencing memorandum arguing for the low term for his voluntary manslaughter conviction based on the mitigating factors that appellant and Cervantes were both intoxicated; Cervantes claimed to be a gang member and was very aggressive toward appellant and his friends; appellant exhibited no sophistication or professionalism in carrying out the offense, but instead exercised poor judgment; and appellant had no criminal history. A probation officer's report also recommended the low term. It noted that appellant had no criminal history, but also indicated the crime was carried out with planning, sophistication, and professionalism, appellant engaged in a pattern of violent conduct indicating a serious danger to society, and the victim was particularly vulnerable. The People did not submit a written memorandum but requested the high term at the sentencing hearing, arguing appellant had fled for 17 years,[6] which made the presentation of evidence more difficult because witnesses had died or could not be found, and arguing appellant's "actions were such that [he] deserves the highest punishment for manslaughter."

At the hearing, the court noted it could not use the first two aggravating factors listed in California Rules of Court, rule 4.421(a)(1) and (2)[7]—that the crime involved great violence and appellant used a weapon—because those factors were already accounted for in the manslaughter conviction and weapon enhancement. The court cited two other factors: it

---

background had no impact on the lack of formality or solemnity of the BAC analysis itself. Appellant's argument is merely an attack on the foundation for Augustine's testimony, a state law issue appellant forfeited by failing to object. (Evid. Code, § 353; *People v. Hinton* (2006) 37 Cal.4th 839, 896-897.)

[6] The court and the prosecutor repeatedly commented that appellant was missing for 17 years, when he was actually on the run for 16 years between the stabbing in 1997 and his arrest in 2013. But this one-year discrepancy could have had no conceivable impact on appellant's sentence.

[7] All further rule references are to the California Rules of Court unless otherwise noted.

believed the victim was "particularly vulnerable" under rule 4.421(a)(3) because he was "very drunk"; and it believed appellant engaged in violent conduct that presented a serious danger to society under rule 4.421(b)(1) because he stabbed Cervantes repeatedly, including at least once in the back, which was potentially fatal. The court recognized Cervantes was not a "boy scout" and Ortega's testimony was "a little bit all over the place," but she testified appellant was part of a group and got angry first, and he and/or his colleagues said to Cervantes, "You'll pay for this outside."[8] While the court recognized appellant was also drunk and "flew into a rage," it did not believe it could consider those facts because the jury already accounted for them in convicting appellant of voluntary manslaughter.

In mitigation under rule 4.423(a)(2), the court noted Cervantes was at least a willing participant in the crime. Appellant also had no prior record, although the court noted "how much time he spent in the U.S. versus elsewhere is sort of unclear." The court rejected reliance on rule 4.423(b)(3)—acknowledgement of wrongdoing at an early stage of the criminal process—because appellant fled the scene and was missing for 17 years (again, actually 16 years, see fn. 6, *ante*).

The court summarized: "[T]he factors that support the upper term are, as I said, he stabbed the victim a number of times, including once in the back; that he was the instigator and engaged in this prolonged fight, basically, with the victim; that he acted in concert with his cousin and perhaps others; and that he ran away after the crime was committed."

Defense counsel argued against the upper term because the jury must have believed Cervantes was the initiator and must have disbelieved Ortega's testimony that appellant said, "We're going to get you outside." Counsel also emphasized appellant's lack of criminal history and the fact that appellant had consumed 10 beers in a two-hour time period

---

**8** The court also noted that Ortega "told police, *at the time*, that [appellant] was part of the group who said, 'You'll pay for this outside.'" (Italics added.) The court was mistaken; according to Ortega's statement to police read into the record at trial, she did not say appellant's group made this comment. But the court correctly noted she testified to that effect at trial, and the court clearly credited that testimony. The court's misstatement therefore had no effect on its sentencing choice.

on the night of the stabbing, which likely led to the jury's manslaughter verdict. Likewise, Cervantes's BAC was nearly three times the legal limit, he made the gang statement, and he "caused the problems."

The court responded, "I guess you and I will have to agree to disagree that it was so clear who was the initiator. Let's assume that the victim was the initiator. Saying to somebody, 'Give the crazy homeless lady a cigarette, dude,' does not necessarily warrant being stabbed repeatedly, including being stabbed in the back. [¶] [Appellant] participated in this escalating fight and I just respectfully disagree that you can say, 'Well, he was really drunk.' So someone can get really drunk and stab someone to death and say, 'Oh, I was really drunk'?"

Defense counsel argued if the court was going to believe one part of appellant's testimony, it should believe the rest of it, which demonstrated "[t]he victim attacked him, punched him in the head repeatedly, wouldn't leave him alone, followed him into the bathroom, told him he was a gang member, and threatened him. So believe all that testimony, and then it's a low-term case." The prosecutor responded, "the undisputed testimony is that the victim had no defensive wounds, no marks on his hands, nothing to support the defendant's story and excuse that the victim beat him. And I think that the jury did take that into consideration. So I agree with Your Honor's assessment that this is an upper-term case." The court rejected defense counsel's argument and imposed the upper term of 11 years for the manslaughter count.

## B. Legal Standards

In selecting an upper, middle, or lower term for an offense, a trial court has discretion to consider "circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision. The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing." (Rule 4.420(b); see § 1170, subd. (b).) "An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.' [Citations.] Aggravating circumstances include those listed in the sentencing rules, as well as any facts 'statutorily

13

declared to be circumstances in aggravation' (Cal. Rules of Court, rule 4.421(c)) and any other facts that are 'reasonably related to the decision being made.' (Cal. Rules of Court, rule 4.408(a).)" (*People v. Black* (2007) 41 Cal.4th 799, 817.) "Neither section 1170 nor the California Rules of Court attempt to provide an inclusive list of aggravating circumstances. Thus, a trial court is free to base an upper term sentence upon any aggravating circumstance that (1) the court deems significant and (2) is reasonably related to the decision being made." (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196.) A single aggravating factor may justify imposing the upper term. (*Black, supra*, at p. 813.) We review the trial court's sentencing decision for abuse of discretion. (*Moberly, supra*, at p. 1196.)

## C. Analysis

Appellant contends the trial court improperly imposed the upper term because Cervantes did not qualify as a particularly vulnerable victim under rule 4.421(a)(3) due to his intoxication; the court's finding that appellant did not acknowledge his wrongdoing under rule 4.423(b)(3) did not justify imposing the upper term; and the court improperly double-counted appellant's violent conduct under rule 4.421(b)(1). Respondent contends appellant forfeited these arguments by not specifically objecting on these grounds in the trial court. Fairly interpreted, defense counsel's argument encompassed the contention that Cervantes was not a vulnerable victim under rule 4.421(a)(3), so appellant did not forfeit that contention. We nevertheless reject his contention on the merits. Defense counsel's argument did *not* encompass appellant's other arguments, so those claims were forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*).) Anticipating the forfeiture issue, appellant argues his counsel was deficient for failing to raise those objections below and he suffered prejudice as a result. Because his contentions lack merit, his counsel was not deficient for failing to raise them. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

The record fully supported the trial court's finding that Cervantes was particularly vulnerable under rule 4.421(a)(3). A "particularly vulnerable" victim "means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's

14

criminal act. An attack upon a vulnerable victim takes something less than intestinal fortitude. In the jargon of football players, it is a cheap shot." (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.) It generally applies "in criminal cases involving violent felonies, where the age or physical characteristics of the victim, or the circumstances under which the crime is committed, make the defendant's act especially contemptible." (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321-322.) "The obvious purpose of increasing punishment based on victim vulnerability is to deter criminal conduct that seeks to exploit the particularly vulnerable victim." (*People v. Spencer* (1996) 51 Cal.App.4th 1208, 1223.)

Appellant focuses exclusively on Cervantes's intoxication to argue he was no more vulnerable than any other victim under similar circumstances. We reject his position. Cervantes's BAC was three times the legal limit, appellant was physically smaller than him, and he did not believe he could have beaten Cervantes in a fight, so Cervantes's intoxication may have allowed appellant to overtake him. Appellant also ignores several other factors showing Cervantes was particularly vulnerable under the circumstances: appellant acted in concert with at least two others, who beat Cervantes and hit him with a beer bottle; and appellant stabbed him in the back. Although other facts might have weighed against the court's finding (e.g., Cervantes's claimed gang membership), the facts cited by the trial court were sufficient to demonstrate Cervantes was particularly vulnerable, supporting an upper term sentence.

The court also properly rejected the application of rule 4.423(b)(3) in mitigation, instead weighing appellant's fleeing the scene and his prolonged absence in aggravation. Certainly, those facts did not demonstrate he "voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process," so it did not weigh as a mitigating factor. (Rule 4.423(b)(3).) To the contrary, as noted above, the court may consider "any other facts that are 'reasonably related to the decision being made.'" (*Black, supra*, 41 Cal.4th at p. 817.) Appellant's fleeing the scene and his 16-year absence—during which evidence was apparently lost and memories had likely faded—was "'reasonably related to the decision'" to impose the upper term, as the court properly found. (*Ibid.*)

Finally, the court did not improperly double-count facts by relying on appellant's violent conduct to find he presented a serious danger to society. (See rule 4.420(d) ["A fact that is an element of the crime upon which punishment is being imposed may not be used to impose a greater term."]; *Scott, supra*, 9 Cal.4th at p. 350.) Voluntary manslaughter can be committed in a myriad of factual scenarios, some more violent than others, but those facts do not constitute *elements* of the crime. Instead, manslaughter is simply "'the unlawful killing of a human being without malice,'" either by acting in a "'''sudden quarrel or heat of passion'''" or in "'''unreasonable self-defense.'''" (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) The court felt appellant's conduct of stabbing Cervantes three times, including once in the back, fell on the more violent end of the spectrum, demonstrating he presented a serious danger to society. That conduct was not an element of his voluntary manslaughter conviction, so the court properly relied on those facts in imposing the upper term.

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

OHTA, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.